THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* JOSEPH CUOZZO, Appellant.

Argued October 13, 1943; decided January 20, 1944.

*George J. Skivington* for appellant. I. The several confessions were each either untrue, impossible, unreliable, contradictory, discredited or unbelievable and must be rejected. II. The verdict is against the weight of evidence. (*People* v. *Cashin,* 259 N. Y. 434; *People* v. *Crum,* 272 N. Y. 348; *People* v. *Weiss,* 290 N. Y. 160; *People* v. *Mummiani,* 258 N. Y. 394.) III. The judgment of conviction should be reversed and a new trial ordered. (*People* v. *Joyce,* 233 N. Y. 61.)

*Elliott A. Horton, District Attorney,* for respondent. I. The defendant killed Lois Tryon after forming a decision to kill her and committed the act with deliberation and premeditation. (*People* v. *Kennedy,* 159 N. Y. 346; *People* v. *Constantino,* 153 N. Y. 24.) II. The defendant was legally responsible, was capable of making a valid confession, and the confessions were properly admitted in evidence. (*People* v. *Moran,* 249 N. Y. 179; *People* v. *Egnor,* 175 N. Y. 419; *People* v. *Silverman,* 181 N. Y. 235; *People* v. *Farmer,* 194 N. Y. 251; *People* v. *Ferraro,* 161 N. Y. 365; *People* v. *Burgess,* 153 N. Y. 561.) III. The People established the guilt of the defendant by the greater weight of evidence and beyond a reasonable doubt. (*People* v. *Becker,* 215 N. Y. 126; *People* v. *Filippelli,* 173 N. Y. 509; *People* v. *Seidenshner,* 210 N. Y. 341.) IV. The confessions may be considered as evidence of the crime charged, and there was sufficient evidence in addition to the confessions to sustain the judgment of conviction. (*People* v. *Brasch,* 193 N. Y. 46; *People* v. *Roach,* 215 N. Y. 592.)

DESMOND, J. On April 6, 1939, Lois Tryon, a nineteen year old high school senior, left her home for an afternoon walk. She lived in a rural section of the town of York in Livingston County, and along the roads she traversed there were occasional farmhouses and barns. It was early spring in Central New York, the air was cold and the ground wet. Lois Tryon's home was at the intersection of two roads, which ran northeast and southeast respectively, and these two roads with another road which ran north and south and which crossed the two roads just mentioned about a mile and a half from her home, made a

roughly triangular pattern with each side about a mile and a half long and with Lois Tryon's home at the apex or most westerly point of the triangle. Starting out on her walk between 2:30 and 3 o'clock on the fateful afternoon, she made her way along the road which formed the left hand side of the triangle, till she came to a candy store in the little hamlet or settlement of Wadsworth at the intersection of that road with the north and south road. After buying a candy bar in a shop at that intersection, she turned the corner and started south along the north and south, or Leicester-York road. Along that road the young girl passed several buildings, one of which is the home of defendant and his family, another a barn which housed cattle belonging to defendant's family. From undisputable testimony it appears that between 4:30 and 5 o'clock that afternoon, the girl reached the next corner of the triangle, called Teed Corners, that is, the place where the north-south road crosses the (Peoria) road which would take her back home. No witness saw her turn that corner into the Peoria road and, aside from the confessions which we shall describe, there is no proof that she ever made that turning or started back toward home. About parallel to the north-south (Leicester-York) road and three or four hundred feet west of it, run the main line tracks of the Delaware, Lackawanna and Western Railroad. Those tracks cross the Peoria road at grade so that, if Lois Tryon did turn right and walk in a northwesterly direction along the Peoria road toward her home, she must have come to the railroad tracks a minute or so after she made the turn at Teed Corners. It appears that there was a footpath running south alongside the railroad tracks from the Peoria road and that there were some houses farther south which could be approached from that footpath, so that it is not impossible that the girl, if she ever reached the railroad crossing of the Peoria road, there turned south and walked along the tracks.

Lois Tryon never reached her home. The next morning two railroad workers found pieces of her mangled body scattered along and near the southbound or westerly railroad tracks a quarter-mile south of Teed Corners. It is satisfactorily established from undisputable physical facts that she was hit and killed by a fast passenger train which at about 7:05 that evening

passed the place where her body was found. On her body were no marks indicating any assault by a human being — there is medical testimony negativing any sexual assault. The local peace officers and medical examiner conducted an investigation and questioned many persons (not including this defendant) but no important information was obtained and the investigation was closed.

Three and a half years later, on September 4, 1942, defendant Joseph Cuozzo, who lived with his mother and brothers on a farm on the Leicester-York road a mile or so from the place where the girl's body was found, was arrested by two deputy sheriffs of the county, on a charge having nothing to do with the death of Lois Tryon. Defendant, though twenty five years old in 1939, had the mentality of a child and was at best a " mid-grade moron ". After his arraignment on the charge for which he was arrested on September 4, 1942, defendant, while having a meal that evening at a restaurant with the two deputy sheriffs, suddenly and for no apparent reason asked the deputy sheriffs whether they " had ever found out who killed the Tryon girl ". The deputies at once reported to the sheriff this suspicious question and the sheriff immediately began to examine into the matter. Taking defendant to the barn on the Leicester-York road where defendant's family kept their cattle, the sheriff there questioned defendant at length. Defendant, with little show of fear and none of sorrow, confessed that he had raped and killed Lois Tryon. That first oral confession ran like this: defendant said that on the afternoon in question, while riding in a truck with his brothers, on the York-Leicester road, from his home to the barn, he saw the Tryon girl walking south in that road, that when his brothers went into the barn to do their chores, he (defendant) followed the girl and caught up with her before she reached Teed Corners. We digress to say that the place where in his first confession he says he met the girl is important, since it afterwards appeared that other persons had seen her that afternoon, unaccompanied by defendant, at a place several hundred feet farther south on the York-Leicester road and just north of the Teed Corners intersection with the west bound or Peoria road. We note also at this point, for a better understanding of the numerous, and in many respects contradictory, confessions, that no one

was ever found who had seen defendant with the Tryon girl, that afternoon or at any other time. The first confession continued thus: defendant said that, meeting the girl at a point north of the Teed Corners intersection, he walked along and talked with her, went with her around the corner into the Peoria road and then walked with her along that road to a point where there is an opening in the fence on the south side of the Peoria road, the opening leading into a field and being, it appears, more than a thousand feet west or northwest of the Teed Corners intersection. At that point, said defendant in his first confession, he asked for and got the girl's consent to an act of sexual intimacy which act, said he, thereupon took place in the field near the fence opening. We think it proper to say here that we cannot and do not credit that statement as to consent. The District Attorney in his opening speech to the jury at the trial, said that Lois Tryon was " highly respected in the community ". Whatever else there may be of truth in the confession, it is beyond all reasonable belief that she submitted herself to this defendant. Further in his first confession to the sheriff, defendant told the sheriff that after the sexual act, he and Lois Tryon walked *north* in the field, in a direction away from her home, toward the railroad tracks, climbed the low embankment on which the tracks ran, then walked south on a path along the tracks, that defendant, walking behind the girl, suddenly struck her several times on the head with an iron bar which he had found nearby, felling her; that he did not know why he did it but " his head bothered him "; that he placed her body on the rails, then went down the embankment and hid and waited till the 7:05 train went by, whereupon he climbed back up the embankment, viewed the dead and dismembered body, then went home to bed. The oral confession just summarized was the first of eleven extra-judicial confessions by defendant, seven of them oral and four of them written, all made within a month and furnished by defendant, apparently, without reserve or fear and with little appearance of sorrow, to all who would listen. In the first of the written confessions, made to the sheriff a few hours after the first oral admissions, defendant repeated his incredible story as to the girl's consent. Later, however, he must have thought better of this, since in all the confessions after the

first two, he described in fullest detail a forcible rape. That was not the only change he made in his story. In his first few confessions he stated explicitly that his meeting with the girl was on the north-south road at a point well north of Teed Corners. Later he changed that materially by placing the meeting at a point well past the railroad tracks on the Peoria road, perhaps a quarter-mile from the place described in the earlier confessions. The significance of that change is real. Defendant's new fixation of the place of meeting was made after one of the investigators, an attorney, had told defendant that defendant's first locations of the place where he caught up with Lois Tryon were " not right ". Promptly and obligingly defendant changed the place. If he had not so changed it, his whole story would have collapsed since reliable witnesses had appeared to say that they saw the girl alone, some time after she had passed the place first fixed by defendant as the exact place where he met Lois Tryon. We will not describe all the confessions in detail nor all the discrepancies therein. The discrepancies are numerous and not inconsequential particularly in such a case as this where no person save himself, and no fact, describes defendant as the killer. In one of the confessions defendant referred to taking off the girl's coat before assaulting her — he mentioned this in no other place. (Incidentally he described the girl's coat as dark whereas it was light tan or brown in color.) In the first confession he did not say whether or not he had told anyone of his crime (before he talked to the sheriff); in the second confession he said that he did not tell anyone and in the third he recounted that three or four days after the killing he confessed to his mother (the mother on the stand denied this). In the fourth and subsequent confessions defendant said that after the forcible rape he and the girl " walked nice " together, a statement not only difficult of belief in itself but quite inconsistent with his earlier descriptions of their movements after the (alleged) sexual act. In two of the confessions, and in none of the others, he related that the girl threatened to tell her father — there is no mention of such a thing in the other confessions. In one of the confessions defendant told of the girl screaming after he hit her. There is nothing of that in the other confessions. Besides these internal differences (and

there are others in the confessions) there is at least one sharp conflict between the admissions and the uncontroverted fact. In all the confessions defendant's story was that after the alleged intimacies he and the girl walked a considerable distance through the fields which were rough from the previous fall's plowing and muddy from the spring rains. Yet, when the body was found, the girl's shoes and rubbers were lying apart from the mutilated remains, uninjured and clean of mud, between the tracks. There is nothing in any of the confessions to explain that.

Having examined those confessions with an eye to trustworthiness, we pass to a consideration of an entirely different question connected with the confessions. Defendant did not take the stand. Section 395 of the Code of Criminal Procedure lays down the rule that a defendant's confession " is not sufficient to warrant his conviction, without additional proof that the crime charged has been committed." Obviously that statute requires proof outside the confession, of the *corpus delicti,* which " in case of murder or manslaughter, means the body of a crime, and is divided into two component parts, the first of which is the death of the person, and the second is that the death is produced through criminal agency " (*People* v. *Benham,* 160 N. Y. 402, 425; *Ruloff* v. *People,* 18 N. Y. 179, 192). Section 395 has been examined, explained and applied in a great many cases in this court. " There must be evidence in addition to the confession to prove the *corpus delicti,* but when * * * the *corpus delicti* is proved by independent evidence, and the defendant has voluntarily confessed his guilt, a case for the jury is made out, and a conviction based upon such testimony is warranted in law " (*People* v. *Roach,* 215 N. Y. 592, 600). In that case the court noted (p. 601) that " without regard to any of the confessions " the fact that the deceased was *murdered* was abundantly proven. " The meaning of the Code is that there must be some evidence of the *corpus delicti* besides the confession, the purpose being to require some proof of the death, and the violence which caused it, outside of and beyond the mere confession of the prisoner " (*People* v. *Deacons,* 109 N. Y. 374, 378).

The finding of a dead body is not such proof *aliunde,* but the statute is satisfied by the finding of the dead body " with the unmistakable marks of a murder committed " (*People v. Deacons,* at p. 378). In nearly all the murder cases where the courts have found in the record sufficient outside evidence of the homicide, there has been convincing proof, *dehors* the confessions, of wounds not only fatal but homicidally inflicted (see *People v. Deacons, supra,* at p. 378; *People v. Fanning,* 131 N. Y. 659, 661, 662), for " the danger that a crime may have been confessed when no crime in any degree has been committed by anyone is then sufficiently averted " (*People v. Lytton,* 257 N. Y. 310, 314; for a list of confessed crimes that never really were committed, see 1 Wharton on Crim. Law, 12th ed., § 357). In some of the cases (such as *People v. Burness,* 178 N. Y. 429), there is proof of motive, presence at the crime et cetera, besides the marks of wounds obviously inflicted by a human being. In others, such as *People v. Brasch* (193 N. Y. 46) the wounds or cause of death were such as might or might not have been of human causation but there was, in addition, compelling proof of motive, presence at the scene, guilty appearances afterward, et cetera. The additional evidence need not in itself " amount to direct proof of defendant's murderous act " (*People v. Brasch, supra,* at p. 59) and the confessions themselves may be used as a key or clue to the explanation of circumstances, which when so explained, establish the criminal act. (*People v. Jaehne,* 103 N. Y. 182, 199, 200.) " Full, direct and positive evidence of the *corpus delicti,* that is, death as the result of the criminal agency of another as the means independent of the confession is not required " (*People v. Conroy,* 287 N. Y. 201, 202), and the additional evidence may be sufficient even though it fails to exclude every reasonable hypothesis save that of guilt (*People v. Badgley,* 16 Wend. 53; *People v. Jaehne, supra,* at p. 199); it is sufficient if it shows guilty human agency although not showing *defendant's* participation in the crime. (*People v. Deacons, supra,* 109 N. Y. 374, at pp. 377, 378.) But there must be some additional proof of whatever weight, that the crime was in fact committed by someone, which additional evidence of the body of the crime may be either direct or circumstantial. (*People v. Carr,* 3 N. Y. Cr. Rep. 578.) Wigmore points out that while

some few jurisdictions are satisfied if the confession be bolstered by any proof which tends to *corroborate the truth* of the confession, that is not the law in New York. (7 Wigmore on Evidence, 3rd ed., § 2071.) Any expressions in *People* v. *Brasch* or *People* v. *Jaehne, supra,* which seem to suggest the less stringent rule, must be read in the light of the statements in those very opinions that the records in those cases contained very strong circumstantial evidence outside the confessions, not of the truthfulness of the confessions in some detail or other, but of the commission of the crimes charged in the indictments. For recent cases in this court strictly applying the rule of section 395 see *People* v. *Fitzgerald* (288 N. Y. 58) and *People* v. *Popoff* (289 N. Y. 344). In the *Popoff* case a conviction for arson was reversed (see opinion at page 347 as to the fifth count) on the ground that testimony of a witness that he drove defendant to the city where the crime was said to have been committed and there saw defendant going to, and later coming from, the direction of the building that was to be burned, was not sufficient additional proof of the body of the crime. At the risk of repetition, but because we believe that the requirements of section 395 were not met here, we restate the rule in the words of Judge FINCH at page 378 of the *Deacons* opinion " There must be some other evidence of the existence of the criminal fact to which the confession relates." In the present case, as we shall show in the next paragraph, there was not additional proof of the " criminal fact " but only a naked confession supplemented by a showing by outside proof that some of the statements in the confessions were true. Such a corroboration of the partial truthfulness of the confessions might have its place in weighing the whole evidence to see if it made out a case beyond a reasonable doubt. But it does not satisfy the statutory command of section 395. In the *Deacons* case, where mention is made (at p. 382) of the separate proof showing the accuracy of the descriptions in the confessions of the interior of a certain house, that separate proof is *not* treated as additional proof of the *corpus delicti*; the additional and entirely different proof of the *corpus delicti* is described and passed upon elsewhere in the *Deacons* opinion (p. 378).

In his brief on this appeal the District Attorney lists ten different items of evidence outside the confessions each of which "corroborates" some statement or other in the confession, and he argues that this corroboration establishes that defendant is the killer. Such corroboration there may be, and it may make it seem "possible and perhaps probable" (*People* v. *Gordon,* 194 App. Div. 665, 667) that defendant is in truth guilty, yet corroboration of the truthfulness of a confession is no answer at all to the demand of section 395 for additional proof of the *corpus delicti.* The corroborative evidence listed by the prosecutor at this point in his argument, is as follows: defendant's brother confirmed defendant's confessional statement that defendant, while riding with his brothers on the truck, saw Lois Tryon walking on the highway; the girl's mother confirmed defendant's statement that the girl wore short stockings, a bandanna or kerchief on her head and underwear of a certain kind and color; the sheriff's testimony showed that after defendant in his first confession had described the hole in the fence on the Peoria road, defendant showed the sheriff the very hole in the exact place; defendant's statements in the confessions as to the time the train passed, as to its headlights being lighted, as to its being on the south-bound tracks and as to the girl's body being mangled, were all corroborated by trial witnesses; the prosecutor says that the statement in one confession that the girl threw away a paper candy wrapper is borne out by proof that she had bought a candy bar at the crossroads store in Wadsworth and that a partly eaten bar was found in her pocket after her death; finally, we are told, defendant's description of the train carrying the body some distance beyond a trestle is confirmed by the testimony of witnesses as to where the body was actually found. It is at once evident that nearly all those statements made by defendant in the confessions and said to be "corroborated" by other witnesses are as to matters which were of common knowledge in the vicinity or as to details which defendant might have observed when he visited the scene on the morning *after* the death. Indeed, the only item to which that explanation would not apply would be the description of the girl's underclothing. Nothing in the record gives us any clue as to how defendant found that out

unless he was the killer. But that one mysterious and unexplained piece of special knowledge on his part, significant though it may be and important as it surely would be on the question of the *weight* to be given the confession, is not proof of a homicidal killing, and neither is any other of the listed items of " corroboration ", or all of them together.

It was, we assume, to those alleged corroborations of the veracity of the confessions that the Trial Justice referred when he told the jury in the charge that " in addition to these confessions the people have introduced, as I have said, both direct and circumstantial evidence tending to corroborate the statements of the defendant as contained in the confessions." The only " direct " evidence in the case (aside from the confessions) is direct evidence that the girl died of injuries. In that sense the phrase " direct evidence " may have been accurately used in the above quoted excerpt. But there certainly was no " direct " evidence (we hold there was no evidence at all) outside the confessions that the crime charged had been committed. Yet on that point the language of the charge was: " Furthermore, you may not convict this defendant solely upon these confessions or any statements or admissions made in them. There must be proof in addition to such statements or confessions that the crime charged has been committed. *The people have produced evidence in addition to these alleged confessions some of which is direct and some circumstantial* " (emphasis supplied). That was a flat statement to the jury that the People had complied with section 395, and there is nothing else in the charge to offset it. Furthermore, the court, beyond informing the jury that there was, outside the confessions, both circumstantial and direct evidence of the commission of the crime, nowhere listed, described or identified that evidence. The effect of all this was to eliminate from the case altogether, any question either of fact or law as to compliance with section 395.

Since the jury found against defendant on both issues, we do not discuss the alleged insanity of defendant or the attempt to prove an alibi.

The judgment of conviction should be reversed and a new trial ordered,

CONWAY, J. (dissenting).  About three o'clock on the afternoon of April 6, 1939, Lois Tryon, nineteen years of age, of robust health, and happy disposition, soon to graduate from high school, and living with her parents in a farming district of Livingston County, left her home to take a walk.  Proceeding easterly along the Old State Road she passed the home of the Flynn family, and spoke to one of the Flynns saying that there was nothing better than walking for exercise.  About a mile or a mile and a half to the east of the Flynn home, she came to the store of one Patanella.  She entered the store, purchased a chocolate candy bar, and left the store about 4:00 or 4:30 and proceeded southerly on York Road.  She was next seen by Frank Cuozzo, a brother of the defendant, when she passed the Cuozzo home.  Frank Cuozzo is a member of a family which then consisted, in addition to his mother, of his wife, their three children, his two brothers, of whom the defendant was one, and two of his sisters.  As the young woman passed that home she was identified by Dominick Cuozzo, a brother of Frank and of the defendant.  At that time the defendant was in the barn doing some chores.  At about 4:30 or 4:45 Frank Cuozzo was driving his truck toward what is known as the Donnan barn.  In the truck with Frank were his brother Dominick, the defendant, a brother-in-law and another man, four of the men being in the cab of the truck and the defendant being in the rear of it.  Frank Cuozzo saw the young woman again as the truck was nearing the barn. She was still continuing in a southerly direction.  When the truck reached the barn, the defendant and two of the men left it, and Frank Cuozzo and his brother-in-law drove away. Lois Tryon next was seen when passing the home of one Cleveland.  She was next seen by three girls about 4:30 between 400 and 500 feet north of Teed's Corners still walking south on the York Road.  They waved to her and she waved in return; she was not again seen alive.

The following morning a portion of her dismembered body was discovered by two railroad patrolmen some 1,300 or 1,400 feet south of Teed's Corners.  Parts of the body were strewn over a distance of a quarter of a mile.

More than three years later, on September 4, 1942, the defendant was arrested by two deputies sheriff.  He was

arrested, " on a morals charge," as his counsel describes it.
After his arrest he was taken to the county seat at Geneseo
and since it was too late for him to have dinner in the prison
he was taken to a restaurant in that village. While at dinner
the defendant " spoke up and asked if we (the deputies sheriff)
had ever found out who killed the Tryon girl." That seemed
significant to the arresting officers and he was immediately taken
to the Livingston County Jail and in the late hours of the same
night he was taken by the sheriff and two deputies to the Donnan
barn on the Leicester-York road, to which reference has been
heretofore made. There he was questioned and he confessed that
he had attacked the deceased and thereafter had rendered her
unconscious by striking her with a bar and then placed her upon
the railroad tracks. The defendant made subsequent confessions
some oral and some transcribed by a stenographer and sub-
scribed by defendant. It is unnecessary to go into the details at
length. In one which he subscribed after relating his attack on
the deceased near the gap in the fence he said: " I walked along
beside her until we reached the fence on the west side of the
railroad tracks. I held the fence while she got over and then
I got over. After getting over the fence we climbed up to the
tracks. She turned and walked toward the south along the
path on the west side of the tracks. I walked right behind
her as the path was narrow. After we had walked a short
distance I saw a piece of iron bar lying alongside the tracks and
stooped and picked it up. She did not see me do this. A short
distance before we reached the trestle, I grabbed her right
arm with my left hand and swung her around and hit her on
the forehead just above the nose with the iron bar which I
was holding in my right hand. I struck her with this bar
either three or four times. She fell to the ground beside the
track. There are four rails and she fell beside the west rail.
After she fell to the ground she was quiet but was still
breathing. It was getting dark at this time. I then dragged
her body a little further south and placed her over the west
rail with her back on the rail. I knew she was mad and I
was mad too. I was scared that she was going to tell some one
what had happened and then what would happen to me.
I thought that if I knocked her uncon out and then placed her
body on the track so that a train would run over and kill her that

no one would find out what I had done. When I placed her body on the track I noticed that her stomach was going up and down a little and that is the way I knew she was still breathing. She did not say anything or make any sound after I had placed her body on the track. I then went down the bank beside the track by a telephone pole and waited for a train to come by. I put her body on the west track because I knew that the next train that went down would go over this track. I must have waited about 15 or 20 minutes before the train went by. It was a passenger train as I recall. When the train had gone by I went up the bank to the tracks. I saw the train had carried her body beyond the trestle. I was very scared and started for home at once. I ran and walked down the rail road tracks until I reached a point opposite my home Goodwins lane and then went down the lane and into the road and to my house. My mother and two sisters were in the house. I sat up a little while and then went to bed. I had had my supper before I started to the milk house with my brother Frank and the other boys.''

It seems to us that there are details in that confession which could not have been known to anyone who had not lived through the episode, and could not have been learned from the lips of his neighbors.

There is another matter which the defendant could not well have so learned. Orders were given to make an inspection of all trains arriving at Hoboken on the morning of April 7, 1939. The only evidence that a train had struck a human being was found on the baggage car of train 20. The baggage car was the head car, immediately behind the engine. The engine had been changed at Elmira and was not inspected. On the baggage car in between the spring and spring sections there were found small pieces of flesh and hair. Those were found on the front end at the southeast corner of the car. (It was headed east.) The hairs were examined one week after the accident and were later compared with a sample of the hair of the deceased and were found to be `` identical in color, in size, in texture, in pigmentation and (are) compatible.'' Train No. 20 ran from Buffalo to Hoboken on April 6, 1939. It left Buffalo at about 6:30 P. M., and passed Teed's Corners Crossing about 7:05 P. M. The defendant said he placed

the body of deceased on the rail of the west track toward the Leicester Road. That is the rail over which the southeast corner of the baggage car passed as it headed east and the corner on which the flesh and hair were found.

It is true that the defendant amplified and made changes in his confessions as they were made by him from time to time. There is no testimony in this case that any confession was obtained improperly. There was no denial by the defendant of the truth of any of the confessions. It seems to us that whether the confessions were made, whether they were truthful confessions and whether the defendant had the capacity mentally to make the confessions was a question for the twelve men who sat upon the jury. (*People* v. *Buchalter,* 289 N. Y. 181, 230; *People* v. *Peller,* 291 N. Y. 438.) We cannot say as a matter of law that a man of his type would not be more egotistical in one confession than in another or even more boastful in some than the facts warranted. That is not unusual regardless of mental grade. He did not know what the autopsy would disclose. Moreover, it is not unusual that after three and one half years more details would come to the top of a man's mind in subsequent confessions than in the initial one.

The defendant was twenty-nine years of age with the mentality of one of nine and one-half years. There is, however, no question here of legal insanity. The defendant was committed by the court to the Rochester State Hospital and he was there for three months. The report of the Superintendent showed that he knew the difference between right and wrong and had no sense deception, false ideas or other evidence of psychotic symptoms. In addition the doctor at the psychiatric clinic at Attica State Prison who specialized in criminal psychology examined the defendant. That doctor said that the defendant "was somewhat retarded mentally, classified as a mid-grade moron, but without any evidence of psychosis or insanity" and that defendant had the capacity to make a valid confession. *The defendant went with him to Teed's Corners and made a full confession to him.* The defendant called no doctors to testify that he was insane.

That the defendant had a fair trial is best attested by the language of his own counsel to the jury: "At the outset I want to say in reference to Mr. Horton that I have never sat

through the trial of a law suit where I have received the courteous, careful attention and aid that Mr. Horton has given me in this law suit. Whenever there was a paper that he had I have been furnished with a copy of it, and I can't speak too highly of the manner in which he has presented this case as the District Attorney. My experience with district attorneys is far different. Mr. Horton has no love of the chase or the kill. He has presented his law suit in the fairest way that I have ever in my life time seen a district attorney present a case, and I can't help but express my appreciation of it to him and to you.''

It seems to us that the jury properly inferred that the deceased came to her death by foul means entirely apart from any confession. Indeed it may be said that the facts compelled that inference. Before the defendant confessed his guilt there was a presumption that he was not concerned in her death. That was the presumption of innocence to which he was entitled. There was no presumption that the death of the deceased had been '' caused in any particular way, whether by suicide, by the defendant himself through innocent misadventure, or by the act of some one else, undetected or unknown '' or by misadventure of the deceased upon the railroad track. (*People* v. *Miller*, 257 N. Y. 54, 61.) The jury could well find that the deceased had not committed suicide for the testimony showed that she was not unhappy nor worried nor ill nor despondent nor moody. On the contrary, as we have indicated (*supra*), the testimony was that she was a strong, robust, athletic, happy young girl of nineteen years. She was enjoying the Easter holidays. As she proceeded along she told one Flynn that there was nothing better than walking for exercise. Three girls waved to her a short distance from Teed's Corners where she was last seen and she waved in return. Apparently she was happy in her associations with girls of her age. The autopsy showed that she was a virgin. There was no semblance of support for a suicide theory.

The jury could have considered the possibility of accident on the assumption, although there was no evidence of it, that the deceased walked along the railroad track and was struck by a train. The difficulty with that hypothesis was that the deceased waved to the three girls at about 4:30 o'clock when

she was approximately 450 feet north of Teed's Corners. When her body was found, a considerable portion of it was 1,300 or 1,400 feet south of Teed's Corners. The train that struck her, passed Teed's Corners' Crossing at about 7:05 P. M. That was two and one half hours later. Clearly it did not take two and one half hours to walk 2,000 feet. If the deceased had walked 1,400 feet from Teed's Corners south along the railroad track and had stumbled and fallen, she must have lain there for two and one-half hours. But if she had lain there for that period of time, she would not have been struck by train No. 20 at 7:05 P. M. but by a train that passed over the same track and the same spot at approximately 5:19 P. M. It would have been bright daylight at that time in April and she would have been seen. At any rate she would not have been struck by train No. 20. In addition, a train passed that spot on the other track (west) at approximately 6:36 P. M.

The jury might properly infer, therefore, as it did, that the death of the deceased, since due neither to suicide nor her own misadventure, was the result of the criminal act of some person. They believed the defendant's confession that he was that person but there was proof of someone's crime without the confession.

That leaves but one question and that is whether the prosecution complied with the requirements of Code of Criminal Procedure, section 395, providing that a confession is not sufficient to warrant a conviction " without additional proof that the crime charged has been committed."

The majority opinion leans heavily upon *People* v. *Deacons* (109 N. Y. 374) but the decision and language in the opinion in that case have been explained in the later case of *People* v. *Brasch* (HISCOCK, J.) (193 N. Y. 46, 62) as follows: " In *People* v. *Deacons* (109 N. Y. 374) there was presented to the court for review a judgment of conviction in a murder case which was based largely on a confession of the defendant. In that case it was claimed that the finding of the body of the murdered person was not such additional proof as was required by the Code. The court said in answer to this contention, however: ' That is a mistaken construction. The crime charged was the murder of Mrs. Stone. That fact was conclusively proved by the finding of her dead body with the unmistakable marks of a murder committed. The meaning of the Code is that

there must be some other evidence of the *corpus delicti* besides the confession, the purpose being to require some proof of the death and the violence which caused it, outside of and beyond the mere confession of the prisoner. In a case where the body is not found, and there is no proof of violence or of death except by the confession of the accused, that confession will not suffice. There must be some other evidence of the existence of the criminal fact to which the confession relates. The Code but repeats the pre-existing rule that " there must be proof *aliunde* of the *corpus delicti*, although such proof need not be conclusive." In that case it is true that the dead body of the victim did, as stated by the court, bear ' unmistakable marks of a murder committed ', whereas in this case the body bears no marks indicating whether the deceased got into the water through one agency or through another. But what was said by the court is broad enough to indicate that the dead body found under the circumstances disclosed in this case itself furnished some additional and corroborative evidence without such marks."

In the *Brasch* case the defendant had confessed that he had pushed his wife into the water where, after a brief struggle, she sank and was drowned. She was found in the water at a point indicated in the confession. The body contained no marks, however, which would indicate that a crime had been committed. This court through Judge HISCOCK said: " The death of the deceased concededly has been sufficiently established ' by direct proof,' her dead body having been found and fully identified. But it is insisted that the other essential fact, ' of killing by the defendant,' has not been sufficiently established. In support of this general claim defendant's counsel by exceptions to the charge as made and by requests to charge, which were refused, has presented and now argues the propositions, *first*, that the criminal agency of the defendant under the first section cannot be established even in part by his confession, and, *secondly*, that if such confession could be utilized at all for the purpose of establishing such criminal agency it is not corroborated or supplemented by ' additional proof ' within the meaning of the latter section quoted. This last proposition reduced to its most favorable form is that there is no proof in addition to his confession tending directly and specifically to prove the fact that defendant placed his

hand on his wife and pushed her into the canal; that the dead body does not give any sign that the deceased was pushed into the canal by the defendant as distinguished from jumping or accidentally falling into the water, and that, therefore, it was error for the court to hold in effect that the finding of such body might be considered as a fact in corroboration of defendant's confession and tending to establish that he was guilty of the crime charged.

" This court already has so fully rejected the first proposition, that a defendant's confession may not be at all considered in establishing the commission by him of the crime charged, that we need only refer to the cases on that point. (*People* v. *Jaehne,* 103 N. Y. 182, 199; *People* v. *Beckwith,* 108 N. Y. 67, 74.)

" In like manner I think that both reason and authorities are opposed to the second proposition, that in this case the facts proved outside of the confessions, including the finding of the dead body, do not satisfy the requirements of the statute, even though such additional evidence does not amount to direct proof of defendant's murderous act.

\* \* \* \* \* \* \*

" It is true that the additional evidence does not picture the defendant in the very act of pushing his wife into the water, and it does not describe any particular mark on her body decisively proving that she was pushed in rather than that she fell in. Very probably it does not so conclusively establish the crime charged that we should be willing to affirm a conviction based on it alone. But that is not the question before us. *It is not necessary that it should be sufficient to convict defendant independent of the confession. The question is whether there is any evidence in addition to the confession reasonably tending to prove the crime and thus corroborate the confession.* And it is impossible to answer this question in the negative when we confront the practically undisputed facts which I have already sufficiently stated. It would shock common sense to say in the light of the confession that all of these circumstances do not in any degree tend to prove a crime, and that the requirements of the statute have not been satisfied, and that the defendant should be discharged *because some other impossible evidence has not been produced.*"

Moreover, prior to the *Deacons* case ANDREWS, J., writing in *People* v. *Jaehne* (103 N. Y. 182, 199, 200) had laid down the applicable rule as follows: " It is insisted that under the statute the *corpus delicti* must be proved, or evidence given tending to prove it, wholly independent of the confession, and that no evidence was given, which, disconnected with the confessions, had a legal tendency to prove the body of the crime. * * * But we are of the opinion that when, in addition to the confession, there is proof of circumstances which, although they may have an innocent construction, are nevertheless calculated to suggest the commission of crime, and for the explanation of which the confession furnishes the key, the case cannot be taken from the jury for a non-compliance with the. requirement of the statute. The words of the statute, ' additional proof that the crime charged has been committed,' seem to imply that *the confession is to be treated as evidence of the corpus delicti,* that is, not only of the subjective criminal act, but also the criminal agency of the defendant; in other words, as competent proof of the body of the crime, though insufficient without corroboration to warrant a conviction. ' Full proof ' said NELSON, Ch. J., in *People* v. *Badgley* (16 Wend. 53, 59), ' of the body of the crime, the *corpus delicti,* independently of the confession, is not required by any of the cases; and in many of them slight corroborating facts were held sufficient.' " (Emphasis supplied.)

Very recently we approved the *Jaehne* case and the following charge as correctly stating the applicable doctrine: " Full, direct and positive evidence of the *corpus delicti,* that is, death as the result of the criminal agency of another as the means independent of the confession is not required. It is sufficient to warrant a conviction if corroborating circumstances are shown which, when considered in connection with the confession are sufficient to establish the defendant's guilt in the minds of the jury beyond a reasonable doubt." (*People* v. *Conroy,* 287 N. Y. 201, 202.)

Judgment should be affirmed.

LEHMAN, Ch. J., LOUGHRAN, RIPPEY and THACHER, JJ., concur with DESMOND, J.; CONWAY, J., dissents in opinion in which LEWIS, J., concurs.

Judgment of conviction reversed, etc.