144

The People of the State of New York, Appellant, *v*. Edwin C. Pendleton, Respondent.

Fourth Department, July 6, 1973.

*Stephen R. Sirkin, District Attorney,* for appellant.

*Robert F. Zecher* for respondent.

Witmer, J. The question presented on this appeal is whether the trial court erred in granting an order of dismissal at the end of the People's case, on the ground that the evidence adduced by the People, apart from defendant's confession of the slaying, was insufficient corroboration to present a question of fact as to whether the deceased died as the result of a criminal act.

Defendant was indicted for the crime of murder in violation of subdivision 1 of section 125.25 of the Penal Law in that "on or about August 26, 1972, with intent to cause the death of Virginia Pendleton" he caused her death "by striking with his hands". On August 26, 1972 and on the next day defendant was interrogated by the police who also interviewed other persons in connection with their investigation in this case. It was ascertained that on the evening of August 25 defendant and his wife, Virginia Pendleton, held a clambake at their home to which were invited 10 other persons, including defendant's brother Eric and wife Georgia, friends William Erickson and Pauline Griffin, and also Ronald Blaisdell (Virginia's son by a prior marriage) and his wife Kathy, and Cheryl Blaisdell (Virginia's daughter by that prior marriage, who lived with defendant and Virginia) and her boyfriend James Gonyeau. In preparation for the clambake defendant had dug a pit four feet and three inches long by three feet and three inches wide and 18 inches deep, lined on the bottom with bricks, which pit was about 63 feet

from the house. There was a downward slope from the house to the pit and beyond the pit from the house was a marsh. Defendant had built a fire in the pit and during the day of the bake the ingredients thereof were cooking.

After the dinner the guests and hosts sat around the fire at the pit finishing up a keg of beer. At about 1:00 A.M. on August 26 they ran out of beer, and defendant and Virginia, Eric and Georgia in one automobile and William Erickson and Pauline Griffin in another left for an entertainment club. The Blaisdells and James Gonyeau left for home shortly thereafter, and Cheryl turned out the lights and went to bed. After an hour or so at the entertainment club, at which they each had a couple of drinks and defendant slept a good deal, William Erickson and Pauline Griffin left for her home and defendant and Virginia, Eric and Georgia returned to defendant's residence, arriving there a little after 2:00 A.M., and they sat around the fire pit. Defendant and Eric both slept in chairs there and Virginia and Georgia drank '' Pussycats ''. Eric awoke a little after 4:00 A.M. and he and Georgia left for home, leaving Virginia lying on a chaise lounge and defendant sleeping in a lounge lawn chair, both near the fire pit.

The police arrived at defendant's home a little after 6:30 P.M. on August 26 in response to a call that Virginia was missing. In answer to police questions defendant at first denied knowing of Virginia's whereabouts, telling them that he recalled seeing her near the fire pit at about 2:30 A.M. that day. In the afternoon of that day Virginia's son, Ronald, had come to the residence and helped search for Virginia. At 7:30 P.M. Ronald discovered bones in the fire pit, including what appeared to be a human skull adhering to a partially burned log, which he had turned over. The coroner was then called and he carefully examined the bones and identified them to be from a human body.

When confronted with this information defendant gradually revealed knowledge of Virginia's disappearance, and finally confessed to striking her with his hands, putting her body in the pit and cremating her. At an early point in his statement to the police defendant said that he awoke at 5:00 A.M. beside the pit, smelled something burning, found that the chaise lounge mattress (on which Virginia had been lying when Eric and Georgia left a short time before) was afire and he got up, picked it up and threw it onto the fire in the pit. He then asked the officer, rhetorically, '' Could she have been on the mattress, could I have done it? '' Thereafter he told the police that he '' felt that Virginia was in that pit, in the fire pit '', that he recalled seeing her in

the pit, on fire, and said that he then put the mattress on top of her and sat down by the pit for a few minutes and watched the fire burn; and then he went to the nearby woodpile, making three or four trips, and got logs and put them on top of her body.

The police asked defendant how Virginia's body got into the pit. He replied that when he awoke he saw Virginia come walking down the slope from behind the house and he asked her where she had been. She replied, "no place." He began to argue with her about this and he grabbed her with his left hand and struck her, and she fell. He then picked up her body and placed it in the fire pit. He stated that embers from the fire were caused to land on the chaise lounge mattress which began to burn, and so he picked it up and put it on top of Virginia's burning body in the pit. He said that he knew that his wife was dead when he put her in the pit; otherwise he could not have done it.

A little later he told the police that when he awoke near the fire pit Virginia was not there and he searched for her in vain, and on returning to the pit, he found her near it. He then asked her where she had been and when she replied, "no place", they argued and he struck her and placed her body in the fire pit.

Evidence was introduced in the People's case that when Virginia drank intoxicants she would become unsteady on her feet and was inclined to fall; that she did fall while dancing that night at the entertainment club; and that while sitting on a chair near the pit that morning she fell off, which caused Eric to wake up. Georgia testified that after the four of them returned to defendant's residence from the entertainment club, Virginia and Georgia drank alcoholic drinks, Pussycats, which were made in the house. She testified that on two occasions that morning Virginia carried two such drinks from the house, one in each hand, and brought them out to drink with Georgia near the fire. Georgia also testified that when Virginia walked up the slope to enter the house she did so without assistance.

There was evidence that when Eric and Georgia decided to leave for home that morning Virginia said that she was going with them, and said that, "she just had to go"; but upon their insistence she lay down on the chaise lounge. When they left, that chair and the lawn chair upon which defendant was sleeping were nearer to the pit than they were the next forenoon, as shown in the photographs taken that next day. Also, when they left, the fire in the pit had died down to a bed of red hot coals.

None of the guests who testified heard any argument between defendant and Virginia that night but, to the contrary, there was evidence that defendant was very solicitous of her.

Virginia's daughter, Cheryl, testified that she woke up and got up at 7:00 A.M. on Saturday morning, August 26, on hearing an automobile slow down and drive in. It was defendant returning home, and she saw him then enter the living room from the porch. Defendant said, "Good morning", to Cheryl but did not inquire about Virginia; and when Cheryl asked him "where everybody was", "he said that he didn't know", and said nothing else about Virginia. At 7:30 A.M. she noticed that the pit was burning — she saw flames in it, but she saw no one put anything on the fire that morning. At 9:00 A.M. Cheryl went with defendant to get beer. On cross-examination Cheryl said that defendant told her that he had gone to Eric's home early that morning looking for Virginia; that William Erickson telephoned defendant from Eric's home, and defendant and Cheryl drove to Eric's house after stopping for the beer; and that on being told at Eric's house that Virginia wasn't there, defendant "looked very concerned".

Pauline Griffin testified that at about 6:30 A.M. after the party defendant telephoned her and asked whether Virginia was there and also whether William Erickson was there, and that she answered "no" to both questions. She said, however, that in fact William Erickson was there. Before 10:00 A.M. Pauline and William went over to Eric's house and told Eric and Georgia about defendant's 6:30 A.M. telephone call to Pauline. William Erickson then called defendant on Eric's telephone. Erickson reported to them that defendant said that he was going to get some beer and would then come over to Eric's. Defendant and Cheryl arrived at Eric's house at about 10:00 A.M. with two six-packs of beer. Pauline testified that when defendant arrived at Eric's home there was no conversation about Virginia until after Pauline asked him where Virginia was, and Pauline did not say what defendant replied. On cross-examination Pauline said that when defendant was asked at Eric's home where Virginia was, he answered, "Here". Georgia testified that when defendant and Cheryl arrived at her home that morning they assumed that Virginia was there and asked for her.

All six of these persons then returned to defendant's place and hunted for Virginia. Besides looking in the house, barn, marsh and roads, they looked into the clambake pit. Defendant had told them that the mattress had burned and they saw the outline of its burned-out remains on the fire with only a little smoke arising therefrom. They saw no one put anything into the pit.

Georgia saw drag marks on the ground leading directly to the pit from the chair on which Virginia had lain when Eric and

Georgia had left early that morning. Pauline poked into the pit two or three times but saw nothing significant. They did not then rake it. At about 12:30 P.M. Saturday noon Eric and Georgia and William Erickson and Pauline left on a week's boating trip which they had previously planned.

Cheryl testified that after the others left on Saturday noon, in the afternoon defendant was standing in front of the pit and called her over to it and asked if an object he was noting looked to her like a piece of bone, and she said that it looked to her like wood. She also said on cross-examination that defendant told her that morning that he had driven over to Eric's looking for Virginia.

The evidence shows that Virginia was 39 years old and five feet tall; and that defendant was her third husband, after Ralph Blaisdell and Robert Confer.

The coroner testified that he could not determine the cause of death; but he was allowed to state, based upon what he saw and heard, that in his opinion Virginia was dead before her body entered the pit.

CPL 60.50 provides, '' A person may not be convicted of any offense solely upon evidence of a confession or admission made by him without additional proof that the offense charged has been committed.''

The cases hold that the evidence introduced in addition to a defendant's confession must establish that a killing occurred through a criminal agency (*People* v. *Reade,* 13 N Y 2d 42; *People* v. *Cuozzo,* 292 N. Y. 85; *People* v. *Brasch,* 193 N. Y. 46; *People* v. *Coleman,* 20 A D 2d 267, affd. 14 N Y 2d 898; *People* v. *Jennings,* 40 A D 2d 357; *People* v. *Greenwood,* 20 A D 2d 272; *People* v. *Rooks,* 40 Misc 2d 359, 367–373).

The District Attorney argues that the evidence in this case, apart from the confession, was sufficient to create a question of fact for the jury as to whether Virginia's death was the result of defendant's criminal conduct. The trial court, relying primarily upon *People* v. *Cuozzo* (292 N. Y. 85, *supra*) did not agree. It appears to have found that there was no proof that Virginia had not accidentally fallen into the pit and thereby met her death.

In the *Cuozzo* case (*supra*), the defendant was of low mentality. The court found that his statements were incredible and that the extrinsic evidence merely confirmed the confession but did not afford a basis for a jury to find that the deceased died as the result of a criminal act, and thus '' ' the danger that a crime may have been confessed when no crime in any degree has been committed by anyone ' '' was not '' ' sufficiently

averted ' '' (p. 92, quoting from *People* v. *Lytton,* 257 N. Y. 310, 314).

In *People* v. *Reade* (13 N Y 2d 42, 45, *supra*) Judge FULD reviewed the law applicable herein and stated that the required extrinsic proof may be circumstantial and (quoting from *People* v. *Jaehne,* 103 N. Y. 182, 199–200) need not " ' exclude every reasonable hypothesis save that of guilt ' '' and that " ' when, in addition to the confession, there is proof of circumstances which, although they may have an innocent construction, are nevertheless calculated to suggest the commission of crime, *and for the explanation of which the confession furnishes the key,* the case cannot be taken from the jury for a non-compliance with the requirement of the statute ' '' (emphasis added). He added (pp. 45–46) that, " It is for this reason that presence at the scene, proof of motive, evidence of flight *and other conduct indicating a consciousness of guilt* may, as indicated, be held to constitute the essential additional proof '' (emphasis added).

In *People* v. *Jennings* (40 A D 2d 357, 362, *supra*) the court sustained the conviction in circumstances having a similarity to the case at bar. The court held that " the confession may supply the key to the understanding of the circumstances of the evidence introduced beyond the confession ''; and added that " Moreover, the confession alone is enough to implicate the defendant; the independent evidence need not connect or even tend to connect the defendant with the crime (*People* v. *Taleisnik,* 225 N. Y. 489, 494; *People* v. *Clark,* 228 App. Div. 670).''

The substantial extrinsic evidence in the instant case would permit the jury to conclude that Virginia had been cremated in the pit (except for some unburned bones). They could find that at about 4:00 A.M. on August 26 the fire in the pit consisted only of red hot coals; that at 7:30 A.M. Cheryl saw flames in the pit; that at 10:00 or 11:00 A.M. there was the outline of the remains of the missing chaise lounge mattress on the fire and two partially unburned logs in the pit, with only a little smoke rising therefrom; that the deceased's purse was on a chair near the pit; that at 6:30 A.M. defendant telephoned to Pauline and asked not only whether Virginia was there but also was William Erickson there; and that there were drag marks from the chaise lounge, on which Virginia had been lying at 4:00 A.M., leading directly to the pit. In addition, there are questions of fact with respect to defendant's conduct in the face of questions as to Virginia's whereabouts, his conduct and answers to the police constituting evasion and a denial of knowledge of the occurrence and eventual change of story to a confession; and his question

to Cheryl at the pit in the afternoon of Saturday, August 26, as to whether she thought an object in the pit which he was observing was a bone, when it seemed to Cheryl to be only a piece of wood. As distinguished from the confession in *People* v. *Cuozzo* (292 N. Y. 85, *supra*) which the court found to be incredible, here the confession has every mark of credibility, horrible as it is.

The evidence that Virginia had the tendency to fall when intoxicated; that no log remained in the pit at 4:00 A.M. and that the outline of the chaise lounge mattress was on top of her burning bones in the pit at 10:00 A.M. and partially unburned logs were then in the pit, may all properly be considered in light of defendant's confession that he threw her into the pit and threw the mattress on top of her and placed additional logs in the pit. This is evidence of a slaying apart from the confession (see *People* v. *Cuozzo*, 85, 93, *supra*), for if Virginia stumbled and fell into the pit, it is incredible that she could have pulled the mattress and additional logs in after her. It is equally incredible that had she fallen into the pit and defendant found her therein, he would have put the mattress on top of her and got logs and placed them on top of her to insure her destruction. In view of the conceded fact that Virginia's body was cremated in the pit that morning, the confession supplies " the key to the understanding of the circumstances of the evidence introduced ", in addition to the confession (*People* v. *Jaehne*, 103 N. Y. 182, 199–200, *supra*; *People* v. *Jennings*, 40 A D 2d 357, 362, *supra*). The evidence was sufficient to present a question of fact for the jury as to whether defendant caused the death of Virginia as charged in the indictment. In the circumstances of this case the words of the Court of Appeals in *People* v. *Brasch* (193 N. Y. 46, 60–61, *supra*), quoted with approval in *People* v. *Reade* (13 N Y 2d 42, 47, *supra*) are particularly applicable, " It would shock common sense to say in the light of the confession that all of these circumstances do not in any degree tend to prove a crime, and that the requirements of the statute have not been satisfied, and that the defendant should be discharged because some other impossible evidence has not been produced."

For these reasons the order of dismissal should be reversed and the indictment reinstated.

GOLDMAN, P. J., MOULE, CARDAMONE and SIMONS, JJ., concur.

Order unanimously reversed on the law and facts and indictment reinstated.