# MARVIN CECIL LEMONS *v.* STATE OF MARYLAND

[No. 1591, September Term, 1980.]

*Decided September 1, 1981.*

The cause was argued before Thompson, Melvin and Couch, JJ.

*Peter M. Levin, Assigned Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Diane G. Goldsmith, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Charles P. Lamasa, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MELVIN, J., delivered the opinion of the Court.

On May 9, 1980, the grand jury of the City of Baltimore filed in the Criminal Court of Baltimore indictment no. 18013002, charging the appellant, Marvin Cecil Lemons, with the first degree murder of one Debbie Kelly "in the month of October", 1968. Prior to trial, the indictment was amended, without objection, to allege the date of the murder as being November 4, 1971. During the trial, it was again amended (this time over appellant's objection) to allege the date of the murder as being December 14, 1969.

On June 25, 1980, a jury found the appellant guilty of first degree murder and he was subsequently sentenced to life imprisonment.

In this appeal he argues, among other things, that "the evidence adduced at trial was not sufficient to support appellant's conviction as there was not adequate evidence of *corpus delicti* independent of appellant's statements." Because we agree with this contention, the judgment of conviction must be reversed.

## The Law

It is well established in this State and the vast majority of jurisdictions elsewhere that a defendant's extrajudicial confession standing alone is, as a matter of law, insufficient to support a criminal conviction. To warrant a conviction, such a confession must be accompanied — or as the rule is

typically phrased, "corroborated" — by some independent evidence. The reason beneath this long-standing rule is that such a requirement is necessary to "protect the administration of the criminal laws against errors based upon untrue confessions alone." *Wood v. State,* 192 Md. 643, 649, 65 A.2d 316 (1949). More particularly, as Judge Moylan observed on behalf of this Court, "The thrust of the principle is to prevent mentally unstable persons from confessing to, and being convicted of, crimes that never occurred." *Borza v. State,* 25 Md. App. 391, 403, 335 A.2d 142, *cert. denied,* 275 Md. 746 (1975). That this concern is real and not frivolous is attested to by psychology and history alike. *See* Note, *Proof of the Corpus Delicti Aliunde the Defendant's Confession,* 103 U. Pa. L. Rev. 638 (1955). Hence, the so-called "corroboration rule" does not rest on idle musings about theorized possibilities but is founded upon sound principle grounded on fact.

Having stated the rule, identified its purpose and confirmed its propriety, we are nonetheless unprepared to apply it to the facts of the present case until we flesh out more precisely just what the corroboration rule requires. Given that a confession must be accompanied by other evidence, we must determine what is demanded of that other evidence both in terms of quality and quantity.

In terms of quality, it is first of all clear, by the very statement of the rule, that this required additional evidence must be, in some sense, "corroborative." As to what is intended by the word "corroborative," in this context, two views have been expressed. The view adhered to by a minority of jurisdictions is that any evidence that tends to fortify the truth of the confession is "corroborative." On the other hand, according to the overwhelming majority of authority, to be "corroborative," in the sense intended by the rule, the evidence apart from the confession must fortify the truth of the confession *in a particular way; i.e.,* it must relate to the *corpus delicti.* Annot., 45 A.L.R.2d 1316, 1327-29 (1956); VII J. Wigmore, Evidence § 2071 (Chadbourn rev. 1978); Perkins, *The Corpus Delicti of Murder,* 48 Va. L. Rev. 173

(1962); McCormick on Evidence, § 158 (Cleary, 2nd Ed. 1972).

As for Maryland, it is reasonably clear that at an early date the Court of Appeals adopted what is now referred to as the majority view. *See Markley v. State,* 173 Md. 309, 196 A. 95 (1938); *Weller v. State,* 150 Md. 278, 132 A. 624 (1926). In both *Weller* and *Markley,* the Court spoke of the need for independent evidence of the *corpus delicti* and, indeed, relied on such evidence in sustaining the convictions there appealed. Subsequently, however, a statement has found its way into the dicta of a number of Maryland cases, both from this Court and the Court of Appeals, that has generated some confusion. That statement, as it was phrased in its first Maryland appearance, is as follows:

> "[C]ircumstances corroborating a confession need not independently establish the truth of the *corpus delicti* at all, either beyond a reasonable doubt or by a preponderance of proof, but *any such circumstances will serve which in the judge's opinion go to fortify the truth of the confession." Wood v. State,* 192 Md. at 650 (emphasis supplied) (citations omitted).

The State in the present case seems to read this quotation as standing for the proposition that Maryland has adopted the minority view of the corroboration rule;[1] admittedly, read in isolation, this statement would seem to be the epitome of that view. Nevertheless, viewing this statement in the context of the cases in which it appears and in light of other Maryland cases on the subject, we cannot accept the reading suggested by the State.

The statement found in *Wood* was adopted by the Court of Appeals from a seasoned opinion of Judge Learned Hand. Viewing that statement in its original context is instructive of the thought intended:

---

1. The State is not alone in its reading of Maryland cases on this point. *See,* Annot. 45 A.L.R.2d at 1329.

"*The corroboration must touch the corpus delicti* in the sense of the injury against whose occurrence the law is directed; in this case, an agreement to attack or set upon a vessel. Whether it must be enough to establish the fact independently and without the confession is not quite settled. Not only does this seem to have been supposed in some cases, but that the jury must be satisfied beyond a reasonable doubt of the corpus delicti without using the confessions, before they may consider the confessions at all. Gray v. Com., 101 Pa. 380, 47 Am. Rep. 733; State v. Laliyer, 4 Minn. 368 (Gil. 277); Lambright v. State, 34 Fla. 564, 16 South. 582; Pitts v. State, 43 Miss. 472. But such is not the more general rule, which we are free to follow, and under which *any corroborating circumstances will serve which in the judge's opinion go to fortify the truth of the confession.* Independently they need not establish the truth of the corpus delicti at all, neither beyond a reasonable doubt nor by a preponderance of proof." *Daeche v. United States,* 250 F. 566, 571 (2d Cir. 1918) (emphasis added) (citations omitted).

Thus viewed, it is apparent that the portion of the above quotation that has been borrowed by the Maryland cases, such as *Wood, supra,* refers only to the *quantity* and not the quality of the corroborative evidence required. That is, it merely stands for the unremarkable proposition that corroborative evidence — to be quantitatively sufficient — need not, by itself, constitute full proof of the *corpus delicti* by any measure. It cannot be read more broadly to imply that the evidence apart from the confession — to be deemed "corroborative" as a qualitative matter — is not required to at least "touch" the *corpus delicti,* for that reading is specifically foreclosed by Judge Hand's prefatory declaration to the contrary.

That the Maryland cases attach the same restrictive meaning to the portion of the statement borrowed from Judge Hand's opinion in *Daeche* is evidenced in part by the

fact that the vast majority of the Maryland cases involving the corroboration rule, including a number of cases that paraphrase the *Daeche* statement, specifically refer to the rule as requiring "independent evidence of the *corpus delicti.*" *See e.g., Hadder v. State,* 238 Md. 341, 352-353, 209 A.2d 70 (1965); *Koprivich v. State,* 1 Md. App. 147, 154, 228 A.2d 476 (1967). Moreover, the State has referred us to no Maryland case and our research has not revealed any in which a conviction was affirmed in the absence of some evidence of the *corpus delicti* aside from the confession. Finally, we think it was made most clear that Maryland continues to adhere to the majority view when, in *Johnson v. State,* 238 Md. 140, 144, 207 A.2d 643 (1965), the Court of Appeals observed:

> "To state that a confession must be 'corroborated' is misleading. What we have consistently held is that an extrajudicial confession of guilt by a person accused of crime, unsupported by other evidence, is insufficient to warrant a conviction, but that *if there is evidence, independent of the confession, which relates to and tends to establish the corpus delicti,* the conviction is justified." (Emphasis added) (Citations omitted).

For these reasons, we conclude that in Maryland, as in the majority of other jurisdictions, evidence is only "corroborative," in the sense intended by the corroboration rule, if it touches or concerns the *corpus delicti* and — in that way — fortifies the truth of the accompanying confession. Evidence that may fortify the confession without relation to the *corpus delicti* will not be deemed "corroborative."

In addition to being "corroborative," in the sense of evidencing the *corpus delicti* to some extent, the evidence that is required to accompany an accused's confession must also be "independent" of that confession. *See, e.g. Jones v. State,* 188 Md. 263, 52 A.2d 484 (1947); *Franklin v. State,* 8 Md. App. 134, 140, 258 A.2d 767 (1969), *cert. denied,* 257 Md. 733 (1970). Stated otherwise, one portion of a confession cannot be used to corroborate another portion, even if the

portion proposed for such use does tend to establish the *corpus delicti.* A confession simply cannot fortify its own truth. Likewise, multiple confessions of a given accused cannot be viewed as corroborative of one another, for the same danger of untruth that is present in one is present in all. *See Williams v. State,* 214 Md. 143, 132 A.2d 605 (1957).

Given that an extrajudicial confession must be corroborated by independent evidence of the *corpus delicti,* it remains to be determined in what *quantity* the independent evidence will have to be adduced to sustain a conviction. As already alluded to, "it is not necessary that the evidence independent of the confession be full and complete or that it establish the truth of the *corpus delicti* either beyond a reasonable doubt or by a preponderance of proof." *Cooper v. State,* 220 Md. 183, 190, 152 A.2d 120 1959); *see Wood, supra.* Indeed, in some cases, such evidence might be sufficient though "small in amount." *Bradbury v. State,* 233 Md. 421, 425, 197 A.2d 126 (1964). Ultimately, the necessary quantum of independent proof of *corpus delicti* is dependent upon the facts of the particular case, *Cooper, supra* at 191, *Franklin,* 8 Md. App. at 140, and such evidence is said to be, "sufficient if, *when considered in connection with the confession,* it satisfies the jury beyond a reasonable doubt that the offense was committed and that the defendant committed it." *Jones v. State,* 188 Md. at 271-272 (emphasis added). More particularly, the Court in *Jones* went on to articulate the two elements of the *corpus delicti* of homicide to which the independent evidence must relate:

> "In a homicide case the proof of the *corpus delicti* is sufficient if it establishes the fact that the person for whose death the prosecution was instituted is dead, and that the death occurred under circumstances which indicate that it was caused criminally by someone." *Id.* at 272.

Distilling these statements to their essence, and filtering that through the *Jackson v. Virginia*[2] standard for testing

---

2. The Supreme Court in Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979), held that, after In re Winship, 397 U.S. 358,

sufficiency of the evidence, the inquiry on appeal as to whether there is adequate independent evidence of the corpus delicti to corroborate a confession to such an extent as to support a murder conviction amounts to the following: considering the independent evidence of the corpus delicti, together with the confession and the circumstances of the particular case, and viewing all of that in a light most favorable to the prosecution, could any rational trier of fact conclude beyond a reasonable doubt that the alleged victim is dead and that such victim was murdered by the accused?

## The Present Case

Eva Appelgate, called as a State witness, testified that she had known the appellant since 1966. In July of 1971 she "started living with him as man and wife" at 1713 Hollins Street in Baltimore. She said that in the year 1974 she had a conversation with appellant "regarding a person known as Debbie. "Appellant told her he knew "Debbie" in the year 1970" at Broadway and Eastern at the Coffee Pot." He further told her that he brought Debbie home and "knocked her in the head - - - with a baseball bat"; that he then "scalped her and took her hair out"; that he "took a knife and cut all the flesh off her bones"; that he did this on the "kitchen table"; that he flushed Debbie's flesh "down the commode" and "the commode stopped up"; that he "took a can of Drano and poured it down the commode" but that "didn't work" and he "had to take the commode up from the floor." Appelgate further testified that appellant told her that "he took a saw and sawed her hands and everything - - on the kitchen table"; that "he took a plier and pulled the teeth out - - so she can't be identified"; that he put the head "in the dog food bag he said and met the garbage truck and put it in there"; that he "took her eyes out too - - to keep her from being

---

90 S. Ct. 1068, 25 L.Ed.2d 368 (1970), the relevant question on review of sufficiency of the evidence, "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original).

identified"; and that he took the bones "to the cellar and took a hammer and broke them up"; and that he put "a dog food bag" containing the hands, feet, hair and bones "into a plastic garbage bag" and "met the garbage truck and put it in."

The record indicates that appellant had been taken into police custody on January 10 or January 11, 1979, on charges unrelated to the present case and that on January 13, 1979, Eva Appelgate related the 1974 conversation she had with the appellant to the police.

Eva Appelgate further testified that from the time she first knew appellant in 1966 until the time of his arrest "on January 10, 1979", appellant was "on drugs", which she described as "LSD, Sunshine, Purple Haze, Marijuana", and that he also "drank vodka on weekends til I would have to take him to bed and put him in the bed myself because I was — I wouldn't want to do anything with him when he was drinking." She also said that appellant told her at the time of the 1974 conversation concerning "Debbie" that what he was telling her "was bad dreams to him - - And he laughed when he was telling me and he told me that it was only a joke, not to pay it no mind." She and her children continued to live with him from July 1971 until he was arrested in January 1979: "He slept in my bed every night with his head on my shoulder right before he was locked up." She also said that on November 4, 1971 [the date alleged in the indictment as the date of the murder] she saw no evidence "of a dismembered body" in the house.

Linda Ciarpello, Eva Appelgate's daughter, was also called as a State witness. She testified that sometime in January 1979, before his arrest, she was playing cards with him at her house in the presence of her sister-in-law and mother. At that time appellant told her that "my mother deserved a better person than him"; that "he had done a lot of wrong and that he had to pay for it." She said she told him that she "couldn't think that he had done that much wrong" and asked him "if he killed anyone." Appellant replied that

"he had killed a woman [3] . . . in one of the bedrooms" and "taken her and chopped the bones up in the cellar and thrown them away in the trash." She asked him why he didn't see a psychiatrist and "he said he was afraid because if the police would find out, they would keep him - - He said he was afraid. He had wanted to turn himself in but he didn't have the courage. Somebody had to do it for him." At the time of this conversation, appellant was "high - - - Either he had been drinking or smoking marijuana." Ciarpello further testified that she had known appellant since 1966 and that she became familiar with his drug habits in 1971; that he took "Purple Haze, LSD, Marijuana"; and that after 1975 he was not taking Purple Haze or LSD "but he smoked marijuana off and on."

Detective Steve Danko of the Baltimore City Police Department testified that after a conversation with Eva Appelgate on January 13, 1979, he spoke with appellant at police headquarters and that after waiving his *Miranda* rights, appellant voluntarily confessed to him that he had killed Debbie Kelly. In a written statement, in question and answer form, appellant said that on "4 November '71," he took her home with him from the White Coffee Pot where he was working with her at the time. "It was raining. She went to bed with me and we had sex and she went to sleep. I got mad about something and beat her in the head with a club. The club broke, hit me between the eyes. I beat her up and had sex with her after she was dead. I stabbed her with butcher knives. Afterwards, I cut her up and disposed of her the same way. I like the thrill of cold sex and sucking the blood." Appellant further said in the statement: "I know something is wrong with me. I think death and ghosts and sometimes it's all clearer to me. Other times these things seem as though they are not so clear."

---

**3.** The record indicates that appellant's actual answer was that he had killed "several women", but the witness was instructed before testifying to say only "a woman" in order to avoid the "other crimes" pitfall enunciated in Ross v. State, 276 Md. 664 (1976).

In addition to this written statement, the State was allowed to introduce into evidence a number of drawings made by appellant that Detective Danko had obtained from Eva Appelgate. These drawings, most of which Eva Appelgate said she saw him make, were for the most part of nude women, some of them headless or with a large knife or sword inserted in the body. One such drawing was dated October 23, 1977; another, dated November 5, 1969, depicted a nude man with a club in his hand standing over a nude woman lying on a couch, and was captioned: "Welcome to the Club!".

The State was also allowed to introduce into evidence a page from a funeral register containing the names of the pall bearers at the funeral of appellant's father in 1976. Above the list of pall bearers, appellant had written "Death of Death" and under that caption the following: "1970 Debie Kelly Balt." [4]

On February 8, 1979, Detective Danko again questioned the appellant at police headquarters. Appellant reiterated the substance of his January 13th statement. During the course of the interview he was asked if he knew of any motive for the murder. His answer was, "Only hallucinations, hallucinating moments, maybe that's something I dream up." He was then asked, "Does your drawings depict some of these acts?" His answer was, "Possible, yes. Thoughts, thoughts on paper, yes. But as far as me, I don't know, it's pointing direct to my feelings, I don't know. I don't understand my own drawings sometimes - - - *I can go and say and get it in my mind that it did happen. It was no bad dreams, that it did happen.*" (Emphasis added).[5]

---

**4.** The original page also contained four other feminine names and an "unknown", each with a date. The dates ranged from 1958 to 1977. These names and dates were expunged from the page shown to the jury.

**5.** In argument to the jury, the State made much of the italicized portion of this answer. Actually, however, this italicized portion was not a part of the answer to the preceding question. The appellant's entire statement to the police on February 8, 1979, was recorded on tape. The entire tape is filed in the record as State's Exhibit No. 14 and includes appellant's statements concerning not only Debbie Kelly but statements concerning the other women listed by him in the funeral register (see note 4, supra) as well as appellant's confession to desecrating a grave at Louden Park Cemetery in

The only other witness called by the State in its case in chief was Pete Ganer, who was the manager of the White Coffee Pot at Eastern Avenue and Broadway from sometime before 1967 until 1980. He testified that Debbie Kelly worked for him there as a waitress "for a couple of months, maybe a little longer" sometime in "1969 or 1970." He said the appellant also worked for the White Coffee Pot chain as a "relief man," sometimes working for him at Eastern Avenue and Broadway and sometimes at other White Coffee Pot locations. Ganer said he "had no problem" with appellant. "He was doing his job as far as I am concerned." He described Debbie Kelly, however, as "the type of a girl that flirted a lot" and "when they happened for those two to work together, she spent more time back in the kitchen than up front taking care of the customers." Because the White Coffee Pot has a policy "that a boyfriend and girlfriend - - - are not supposed to work together," Ganer said he informed Debbie of that policy and she said "she would then have a talk with Marvin." Thereafter, Debbie did not return to work and he heard nothing further about her until 1979 when he "was approached and they told me that she was missing." He said she was "a liar" and he was "not surprised" when she did not return to work.

---

Baltimore. However, in keeping with the goal of all concerned, an attempt was made to edit the tape so as to present to the jury only that portion, together with its transcription (State Exhibit No. 15) that concerned Debbie Kelly. Towards the end of the unedited tape, after being questioned about all of the women, including Debbie Kelly, as well as the Louden Park grave desecration, the appellant made the following statement. This statement does not appear to be the answer to any particular question asked of him:

> "Since you told me it was true about Louden Park, I believe that the rest of them are true now. *Since you did say that was true, well, I think the rest of them are true, then I will go on and say that, get it in my mind, that it did happen, no bad dreams, that it did happen.* So now I'll tell you what I know about bad dreams."

It will thus be seen that the portions of the statement concerning "bad dreams," as heard and read by the jury, was not in the context in which they were made. Read in proper context, they exhibit that appellant's own belief in the reality of his murdering Debbie Kelly, or anyone else, is based not on his recollection of past events but on what he was told by the police concerning an unrelated matter.

Three witnesses were called by the defense. The first witness was Dr. Lawrence Donner, an associate professor in the Department of Psychiatry at the University of Maryland School of Medicine, with a degree in Clinical Psychology and the title of Chief Psychologist, Division of Adult Ambulatory Care, Institute of Psychiatry. He testified that he had examined the appellant on January 9, 1980 for approximately six hours. He said, "The major difficulty Marvin seemed to show in interview information was reality testing. He had difficulty distinguishing between fantasies and real life experiences. It appeared to the examiner he was making heavy use of confabulation, that is the spontaneous invention of imaginary experiences to fill memory gaps without conscious intent to deceive. Throughout this session, he maintained a candid manner with the complete absence of any hostility or resentment." Dr. Donner's diagnosis of appellant was as follows: "On the basis of the history, my psychological testing, my behavioral observation, I made a diagnosis of schizophrenic reaction, chronic undifferentiated type, along with mild to moderate organic brain syndrome, secondary to alcohol and drug abuse."

On cross-examination, Dr. Donner stated that at the time he examined the appellant in January 1980, as well as at the time appellant gave his statements to the police, the appellant was insane ("that he lacked substantial capacity to appreciate his behavior and he also lacks substantial capacity to conform to the requirement of the law"). He further said, "I'm also saying currently, he suffers from the same severe mental disorder and would be also in my opinion legally insane now, right this minute." [6] Dr. Donner further said that in making his statements to the police, "He [appellant] was relating the experiences which he could not determine whether they were dreams, whether they were fantasies, whether they were images, what they were to the police. - - [H]e was not telling them he killed someone. He was telling them images he had. He was completely unsure of himself, whether he had actually done any of these things or not."

---

6. The record indicates that a plea of insanity had been filed by appellant but was withdrawn before trial.

The next witness for the defense was May Arrington, the payroll clerk for the White Coffee Pot Family Inns, Incorporated. She testified that "Deborah L. Kelly" was employed by that company from April 1969 through December 14, 1969, except for the period July 20 through August 24 and one week in September and one week in October. She did not know the reason for her absences, but said it was "not unusual" for a relief girl to have "erratic hours," indicating that "her hours were some weeks no hours, some weeks more than full time."

At the conclusion of May Arrington's testimony, the State moved to again amend the indictment to allege the date of the murder as being December 14, 1969. The amendment was allowed over appellant's objection. At this point in the trial, defense counsel had one more witness to call, Dr. John M. Henderson. Dr. Henderson, however, was not then available and the defense rested its case with the understanding that it could reopen its case the next day when the doctor was available. The State then sought permission from the court to "put on rebuttal testimony at this time." The prosecutor proffered that the purpose of the "rebuttal" testimony would be to contradict Dr. Donner's testimony that appellant's statements to the police concerning Debbie Kelly's murder were in large part "confabulations." The prosecutor proposed to do this by showing that in appellant's statement taken by Detective Danko on January 13, 1979, the appellant had, in addition to talking about Debbie Kelly, also told him about desecrating the grave of one Leah Williams at the Louden Park Cemetery in Baltimore in February, 1974, and by further showing that there was independent proof that Leah Williams' grave had, in fact, been desecrated. The independent proof of the grave desecration was to consist of Detective Danko's investigation of the grave site and his finding that the grave had indeed been disturbed at some time in the past. Detective Danko made this investigation on January 12, 1979, after talking with Eva Appelgate on January 11, 1979, and the next day, January 13, 1979, he questioned appellant about it.

Defense counsel vigorously opposed the proffer, pointing

out to the court that this evidence of an unrelated "other crime" had been expunged from the statement already presented to the jury and that Dr. Donner had not been asked anything about a grave desecration and that his "confabulation" opinion had not been based on any actions of the appellant concerning it. The court opined, however, that appellant's statement concerning the grave desecration was "part of the same confession" made to the police on January 13th concerning Debbie Kelly, "And if the State can prove that a substantial segment of the January 13th confession is true, and that actually happened and was reality, then it could have the tendency, perhaps, to erode the credibility of the Doctor's theory about that confession. And I would say that what is contained in that confession concerning the grave desecration is an offensive and would be viewed by the average person as a sickened act. . . . So, if the State is able to prove that something even more outlandish than murder, something more bizarre than murder actually happened, and as reality and not one's imagination, then it would lend credence, perhaps, to the State's theory that this confession was true." The court ruled that the proffered testimony would be permitted as "rebuttal testimony at this time."

The State then recalled Detective Danko as its first rebuttal witness. He read from the January 13th statement the portion concerning the grave desecration: ". . . Lemons said, Yes, that he did bring home some remains of Leah Williams, Louden Park, like a nightmare. I dug up the grave, banged open the casket, took the woman out, I didn't have sex with her, I think I played with myself. It was too cold to have sex with her. She didn't represent anyone to me, she was a nice lady. When I do these things, it's like a compulsion. You seem to know everything, so I'll talk to you." When asked if he "took anything from the body," he told Detective Danko: "Ring, glasses, she had a grey print dress. I don't know if I took the dress or not. It's been years ago back and asked her spirit to forgive me for what I did to her. Sometimes, when I read about murders, I wish I did it myself."

The prosecutor then asked the court to recall Eva Appelgate "as a Court's witness to permit me to ask leading

questions, because I believe the lady has relevant testimony, extremely relevant testimony to this case and that I cannot vouch for her credibility based on what she's told me. I can't be sure she's going to say anything at all, much less what she's told me on about four or five separate occasions." The court said it would call her as a Court's witness and allow each side to cross-examine her. When she took the stand, the State attempted to elicit from her that the appellant had come home from the cemetery on the night of February 17, 1974 and told her at that time about desecrating the grave of Leah Williams. The attempt was for the most part unsuccessful, her answer to most of the questions being, "I don't know nothing," or "I don't remember." She did say, however, that she had talked to Detective Danko and told him what she knew only because of his promise that she "wouldn't have to testify." She also said she was in love with the appellant and, "I think he's [appellant's] already in trouble with all the other things that I said."

Detective Danko was then recalled in further rebuttal. He testified that after talking to Eva Appelgate on January 11, 1979, he went to the cemetery on January 12th and located Leah Williams' grave and by using a metal probe determined "that there was damage in truth of the portion of the casket." He then obtained an exhumation order from the court of January 16th and uncovered the casket. He found a portion of the casket "broken away" and "the body was laying on its left side in the fetal position with its knees drawn up toward the chest." Large color photographs of the decomposed body in this position were shown to the jury. With that the State rested its case.

The defense then reopened its case and presented the testimony of the previously unavailable Dr. Henderson, an expert in the field of psychiatry and a diplomate of the American Board of Psychiatry and Neurology. He testified that he examined the appellant on two occasions: November 13, 1979 and January 8, 1980. From the history he took from appellant he determined that, ". . . almost every problem he's had of any kind has been involved with some kind of alcohol use or intoxication." He gave the appellant what he

called "the usual mental status examination" which he broke down "into six parts of the person's mental function or psychological function." He testified that "part four is called thought content. . . . Mr. Lemon's thought content was probably the most single strikingly noteworthy part of his exam, because he showed a lot of strangeness in his thought content. It was, we call it bizarre, which is a favorite psychiatric word. It was full of what we call loose associations, which means that he didn't think very logically, he would jump from one subject to another without any real association between subject A and subject B. He would go off, he would have tangential thought. . . . He would go off on tangents. You would ask him one question, he would barely start to answer that and be way out in left field talking about something entirely unrelated from where he started. He also had thoughts which were in the jargon symptoms of psychosis or schizophrenia, if you will, that is they were thoughts which he believed or almost believed, most of the time, that were not real things. . . . [H]e had very unusual sequences of thought. Furthermore with thoughts, he showed a certain striking confusion because, and he himself readily admitted this, he could not tell the difference between real, quote, real thoughts, and imaginary thoughts. He couldn't tell the difference between what he dreamed and what he actually experienced. He told me, and subsequently me and Dr. Donner, a number of hairraising tales about things he had done and things that had happened to him which subsequently proved out to be, to our satisfaction anyway, not true."

Dr. Henderson expressed the opinion, "to a reasonable degree of medical certainty," that at the time appellant spoke to the police in January and February, 1979, he "was [among other disorders] indeed suffering from a mental disorder" known as "schizophrenia which is a disease which routinely begins in adolescence or early adulthood . . . [M]y opinion is that Mr. Lemons has been for a number of years, probably quite a few years, so disturbed that his ability to distinguish, he's so split off of reality, so schizophrenic, that his ability to distinguish reality from nonreality is not good

enough for him to really make up his mind about even what he said and the truth of it and it's certainly not good enough for him to understand from someone else what they are saying if it's at all complicated." He further said that the disease "can flare up and go back down and does flare up and go back down, get worse and get better, and the hallucinations and delusions and any other crazy thing we look for goes up and down, depending on the level of distress that the person is under at the time."

On cross-examination, Dr. Henderson, in explaining "the workings of the mind of a schizophrenic individual", said: "Nothing, no delusions, no hallucinations, no imaginative notion, no matter how strange or unusual it may seem, is totally without basis in fact. It's not totally without basis in reality, which may sound like a contradiction to what I said before, but I'll try to make it clearer. It is that the person who has schizophrenia and some other diseases also will see or hear about or think of something quite ordinary and in their mind, will take it and make it into something quite different. . . . His mind doesn't just sit there and churn out fantasies or imaginations. Something has to be seen or perceived by him and then his distorted, his thought disorder takes over and confused thinking then turns into something else." The final question and answer on cross-examination was as follows:

> "Q. So, is what you are saying basically that what Mr. Lemons told the police was largely imaginary, even though it had a germ of truth?
>
> A. I think it is my opinion that everything that Mr. Lemons told the police is a product of his mental illness, but that there is some fragment there that started off each thought train that he's started talking about."

The State offered no expert medical evidence of any kind.

### Decision

The evidence adduced by the State divides into three categories: 1) evidence that is neither corroborative nor

independent of the appellant's confessions; 2) evidence that is independent but not legally corroborative; and 3) evidence that is both independent and corroborative and is, therefore, of the type required by the corroboration rule. Evidence that falls into the first category includes — in addition to appellant's statements — appellant's drawings and the funeral register. These pieces of evidence, though arguably incriminating and no doubt influential to the jury, are no more than written admissions and, as such, stand on no different legal footing than do the confessions themselves. *See Bagley v. State,* 232 Md. 86, 192 A.2d 53 (1963); *see also Williams, supra; Edwards v. State,* 194 Md. 387, 71 A.2d 487 (1950). That is, they are part of the body of evidence that is to be "corroborated" and form no part of the independent evidence necessary to satisfy the corroboration requirement.

Evidence comprising the second category (independent but not corroborative) consists primarily of the grave desecration evidence.[7] That appellant disturbed the grave of Leah Williams as he said he had was verified quite apart from his confessions. Furthermore, because this portion of appellant's confession was true it may, to a very limited extent, fortify the truthfulness of the confession as a whole. Nevertheless, and most importantly, the grave desecration evidence does not, to any degree, touch or concern the *corpus delicti* of murder, and, for that reason, it cannot be considered "corroborative." Therefore, contrary to the view taken by the State, the trial judge and no doubt the jury, this evidence is not the type that can be used in satisfaction of the corroboration requirement.

The third category of evidence — that which is both independent and "corroborative" — is the type required by the corroboration rule. The only evidence of this type that was adduced in the present case is the fact that Debbie Kelly,

---

**7.** We have assumed, without deciding, that the grave desecration evidence was admissible. Although we do not reach the question, we would note that there is considerable doubt as to the admissibility of this evidence, at least as substantive evidence of guilt. *See* Ross v. State, 276 Md. 664, 350 A.2d 680 (1976); Hepple v. State, 31 Md. App. 525, 358 A.2d 283 (1976), *aff'd* 279 Md. 265, 368 A.2d 445 (1977).

after December 14, 1969, failed to return to work at the White Coffee Pot. This is the sole evidence apart from the confessions that, to any degree, touches or concerns the *corpus delicti, i.e.,* that Debbie Kelly is dead and that her death was criminally caused. However, because this independent evidence touches the *corpus delicti* to some extent and is, therefore, of the type required by the corroboration rule, does not imply that it touches the *corpus delicti* to the extent necessary to *quantitatively* satisfy that rule. In fact, viewing this slender bit of independent corroboration evidence, together with the surrounding circumstances and the equivocal nature of appellant's confessions, and even viewed in a light most favorable to the prosecution, we are convinced that a jury could not rationally conclude — beyond a reasonable doubt — that appellant was guilty of murdering Debbie Kelly.

In every Maryland case reported thus far involving the corroboration rule in the context of a homicide, the victim's body had been recovered and there was other independent evidence, either direct or circumstantial, to suggest that the death was not the result of accident or suicide. *See, e.g., Miller v. State,* 251 Md. 362, 247 A.2d 530 (1968); *Hadder, supra; Jones, supra.* This, of course, does not imply that the inability to produce a body is an insuperable obstacle, in itself, to the obtention and sustention of a murder conviction. This Court, as well as the Court of Appeals, has repeatedly said that the independent evidence of the *corpus delicti* "may be circumstantial in nature when direct evidence is not available," *Miller, supra* at 382; *Franklin v. State,* 8 Md. App. at 140, and there is no reason to believe that this statement does not apply to the fact of death with the same force as it does to the criminal causation. Moreover, courts from other jurisdictions that have been confronted with the "missing body" problem have unanimously concluded that the death of the alleged victim need not be evidenced directly by the production of the body. *See, e.g., Derring v. State,* 273 Ark. 347, 619 S.W.2d 644 (1981); *State v. Lung,* 70 Wash.2d 365, 423 P.2d 72 (1967); *People v. Cullen,* 37 Cal.2d 614, 234 P.2d 1 (1951) Nevertheless, it is clear from these cases that

there must be independent evidence, at least circumstantial in nature, that relates to both elements of the *corpus delicti.* Thus, the problem in the present case is not that the State failed to produce Debbie Kelly's body, for if she was, in fact, murdered as appellant described, there would be no body to produce; rather, the problem here is that the State failed to adduce sufficient evidence, even of a circumstantial nature, that Debbie Kelly is dead much less murdered.

The State argues that the testimony of Pete Ganer, the White Coffee Pot manager, supplies sufficient evidence from which it could, be inferred that Debbie Kelly is dead. Garner's testimony established that there was a friendly relationship between appellant and Debbie Kelly and that Kelly told Ganer she would speak to appellant about the company's non-fraternization policy while they were working together. Ganer's testimony also established that thereafter (*i.e.* after December 14, 1969) Debbie Kelly did not return to work at the White Coffee Pot. From this, the State argues that it might be inferred "that appellant and Miss Kelly had an argument at the time of her disappearance" and that the "circumstances of her disappearance provided some corroboration of the *corpus delicti.*"

We think the difficulties with this argument are manifold. First of all, there is absolutely no independent evidence of any arguments, threats, or harsh words at any time between appellant and his alleged victim. From Ganer's testimony, to infer that there was an argument is sheer speculation. Moreover, on the record before us, there is no evidence that Debbie Kelly has "disappeared." Ganer did not say she disappeared. In fact, to the contrary, he said he was "not surprised," in view of her unreliability, that she did not return. Except for an unsuccessful attempt to learn of Debbie Kelly's whereabouts by checking with "the Social Security Administration," [8] the record is devoid of any efforts by the

---

8. Detective Danko testified that information from the Social Security Administration "was refused us at the time as to privacy . . . to the individual we were making inquiry of."

State to locate her — even at the addresses mentioned by Ganer ("she told me she was from West Virginia. She gave me an address on Broadway and Dundalk, and now I understand she told somebody that she was from Baltimore Street or whatever") or the appellant himself ("All I knew is she lived on West Baltimore Street or East Baltimore Street somewhere, 2110 or something like that . . . originally from Harrisonburg, Pennsylvania"). There is no evidence that any of these locations or any public utility companies were checked to ascertain her whereabouts. Nor is there any evidence as to whether or not anyone (family, friends or acquaintances) has ever reported her missing or inquired of her whereabouts from any public or governmental agency.

While it may be true that Debbie Kelly's failure to return to work at the White Coffee Pot may be consistent with the State's position that she is dead, this evidence, even by the "slight evidence" test enunciated in *Bradbury v. State, supra,* falls far short of meeting the requirement of the corroboration rule. Particularly is this so when the equivocal nature of appellant's statements to the police as well as to Eva Appelgate is concerned, and when, also, the uncontradicted medical testimony is considered concerning appellant's mental disorders.

In summary, we reiterate that the evidence of the *corpus delicti* presented by the State, together with the appellant's statements and all the surrounding circumstances, are legally insufficient to convince any rational trier of fact beyond a reasonable doubt that appellant murdered Debbie Kelly.[9]

This is a case that goes to the very core of the corroboration rule and the interests that that rule is designed to protect. Appellant, by all indications, is a mentally unstable individual with a history of drug and alcohol abuse. He confessed to the crime of murder, but the

---

[9]. In view of this disposition of the case, it is not necessary to consider the other two issues raised by appellant in this appeal: 1) that evidence of "other crimes" was improperly admitted into evidence and 2) that appellant was not mentally competent to intelligently waive his *Miranda* rights.

only independent and legally corroborative evidence of that fact is that the alleged victim failed to return to work one day — a fact that even her employer found unsurprising. To affirm appellant's conviction on such a slender reed, under these conditions, would render the corroboration rule nugatory and worse yet seriously risk subjecting an innocent man to life imprisonment.

> *Judgment reversed.*
> *Costs are not reallocated as part of the judgment of this Court pursuant to Maryland Rule 1082f.*