**Christie SHIPLEY, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted: Sept. 26, 1989.
Decided: Feb. 21, 1990.

Ellis S. Rubin (argued) of Rubin, Rubin & Fuqua, P.A., Miami, Fla., and Benjamin Shaw, III, Georgetown, for appellant.

Richard E. Fairbanks, Jr., Chief of Appeals Div. (argued), Gary A. Myers and Timothy J. Donovan, Jr., Deputy Attys. Gen., Wilmington, for appellee.

Before CHRISTIE, C.J., HORSEY, and MOORE, JJ.

CHRISTIE, Chief Justice:

The defendant/appellant, Christie Shipley ("Shipley"), was convicted of murder in the first degree and possession of a dangerous weapon during the commission of a felony. The Superior Court sentenced Shipley to consecutive sentences of life imprisonment without benefit of suspension, probation, or parole and thirty years' imprisonment without benefit of probation or parole. The victim of the alleged crime was Shipley's husband, William Shipley, whose decomposed body parts were found in various locations in Dover, Delaware.

Shipley raises three issues on appeal. First, she contends that the trial court made a reversible error when it failed to grant her motion to suppress statements she made during questioning, six months prior to her arrest. Defendant contends she gave the statements to police as a result of her counsel's ineffectiveness in advising her to do so in violation of her fifth and sixth amendment rights. Secondly, defendant contends that the State failed to establish each element of the crime charged beyond a reasonable doubt and that it failed to prove the *corpus delicti*, independent of Shipley's statements. Finally, defendant contends that the trial court committed reversible error as a matter of law and in contravention of her fifth and sixth amendment rights by appointing a public defender to represent her when she merely requested expenditure of State funds to hire an expert witness. Defendant contends she wanted to retain her private counsel *and* have the use of public funds to hire experts. We find defendant's contentions to be without merit and affirm the judgment of the Superior Court.

In July of 1984, Christie and William Shipley were living together in Dover, Delaware. Christie worked as a correctional officer and her husband was the director of kitchen operations for an organization known as the Modern Maturity Center.

On Saturday, July 28, 1984, the Maturity Center conducted a picnic excursion to Hockessin, Delaware. William Shipley went along as an after-hours volunteer. The group returned to the Center at about 3 p.m. and, after helping unpack, William Shipley left for home at about 4 p.m. Two of Shipley's neighbors saw William Shipley park his white Oldsmobile in the driveway of his home and enter the house. Approximately one-half hour later, the neighbors saw Christie Shipley arrive home from work in her black Oldsmobile.

That evening, Christie Shipley telephoned Martha Bowman, the manager of a liquor store where she worked part-time. Bowman testified that Shipley told her that she would not be able to come into work on Monday because her husband had abandoned her and had left in his Mercury Cougar. The next day, on Sunday July 29, 1984, Christie Shipley called Florence Hoffman, a secretary at the Maturity Center. Hoffman testified that Shipley told her that William Shipley would not be coming to work the next morning and that he had quit his job. Christie Shipley stated that she and her husband had argued Saturday evening and he had moved out, taking belongings and some furniture away in a blue pickup truck. Christie Shipley, in a later telephone conversation with Hoffman on Monday, July 30, 1984, said that William Shipley had taken his Mercury Cougar, as well as approximately $4,000, when he left. Hoffman indicated to Shipley at that time that she thought William Shipley had traded in the Cougar when he bought his Oldsmobile. Christie Shipley replied that the Cougar had been sitting in the garage.

On Tuesday, July 31, 1984, the director of the Maturity Center, Robert Bonniwell, spoke to Christie Shipley on the telephone. Bonniwell testified that Shipley told him that she and her husband had quarrelled, that William Shipley had driven away in his Cougar, and that he had returned on Sunday (July 29) in a blue pickup truck to remove some of his possessions from their home.

Sometime between July 30 and August 11, Christie Shipley contacted Martha Bowman once more at the liquor store. Bowman testified that this time Shipley asked for some boxes, explaining that she was about to move from her house to the trailer park which she and William Shipley owned.

Bowman had no empty boxes available, but she emptied out a case of Sun Country Coolers and gave Shipley that container.

On August 8, 1984, the Dover police received a complaint that several large green trash bags that had been discarded along Persimmon Tree Lane in Dover had been emitting a foul order for several days. The patrolman who investigated concluded that the bags contained an animal carcass. He called a sanitation crew who removed the bags to the city dump. The next day, maintenance workers at the Fieldcrest Apartments near Dover discovered a human head in a garbage bag inside a Sun Country Cooler carton. The box had been sitting next to the garbage dumpster for several days. After being notified of this discovery, the police went to the dump and reexamined the bags taken from along Persimmon Tree Lane. They then found that the bags contained human body parts, including a full torso, and not the pieces of an animal carcass they had originally thought were in the bags.

The following day, Friday, August 10, the medical examiner's office reported that the remains appeared to be those of a middle-aged white male with full upper and lower dentures. He had been killed by a shot to the back of the neck. The examiner also reported that the trash bags holding the body contained what appeared to be deodorizer pads.

On Saturday, August 11, Christie Shipley and Bowman, the liquor store manager, went out to dinner. Bowman testified that Shipley asked to borrow a pickup truck, stating that she wished to cart some things, including her bed, to the dump.

The next Monday, August 13, 1984, Bonniwell testified that, after reading of the discovery of the body and because he was troubled about William Shipley's disappearance, he called the police and reported that Shipley was missing. In addition, the police were informed that his secretary, Florence Hoffman, while looking for a used car, had seen William Shipley's Cougar in a car dealer's lot in Dover. The police later confirmed that the Cougar was in a dealer's lot in Dover and had been there since early July when it had been traded in by William Shipley. Martha Bowman testified that at this same time, Christie Shipley was asking her for information about dumps, particularly whether those in charge of managing dumps inspected the trash as it was brought in.

The police then obtained a warrant to search the Shipley residence. On August 21, 1984, at approximately 7:45 a.m., police detectives knocked on the front door of the Shipley home and told Christie Shipley who they were and what they were investigating. Christie Shipley invited the officers into her house and then contacted her attorney, William Vaughn, by telephone. Vaughn had previously represented Shipley in several civil matters, but did not practice criminal law. Vaughn told her that if the police possessed a warrant they could legitimately search her home. When the police produced the search warrant signed by a Superior Court judge, Vaughn agreed over the telephone that Shipley would be driven to the State police troop to await completion of the search. The officers promised Vaughn that Shipley would not be questioned until his arrival. Vaughn arrived at the police station at approximately 10 a.m. and spoke to Shipley briefly alone, indicating that the authorities believed they had recovered her missing husband's body. While there, Vaughn did not review the warrant documents or ascertain the results of the ongoing search. Vaughn left the station approximately one hour later to return to his office. Shipley remained at the station. She was visited by several friends as the police continued their execution of the search warrant.

During the search, the police seized a blood-stained mattress, a small section of which had been cut out; a baseball cap; a revolver; an empty revolver box; a box of ammunition; blue fibers from the trunk of Christie Shipley's car; a wrist watch; trash bags; "Can Care" insecticide and deodorizer pads; and a photograph of William Shipley.

Vaughn returned to the troop at about 4 p.m., at which time the police indicated that they wanted to take a statement from Ship-

ley. The police recited the *Miranda* warnings to Shipley, and she responded that she did not want to make any statements. The police then explained that while they were indeed approaching Shipley as a suspect in a homicide, they needed some explanations about her husband's disappearance that only Shipley could provide. Vaughn asked for a few moments in private with his client. During the break, Vaughn told Shipley that "if she did not want to make a statement or if she had any concern or had anything that she was not comfortable with that she did not have to make a statement." Vaughn and Shipley returned and Shipley told the officers that she would answer the police questions "[i]f I can." The officers then questioned Shipley, asking about her relationship with her husband, his disappearance, and the contents of their home. After about ninety minutes, Vaughn became concerned that the detectives were badgering his client and demanded that the police either charge her or end their questioning. The interview was then concluded. Shipley and Vaughn left the police station without Shipley having been charged with any crime.

On November 29, 1984, human legs were discovered in a trash bag at Bombay Hook Wildlife Sanctuary near Dover. On February 13, 1985, more than six months after William Shipley disappeared, Christie Shipley was arrested and charged with the murder of her husband and possession of a dangerous weapon during the commission of a felony. A not guilty plea was entered on her behalf.

Shipley filed a motion in Superior Court to suppress the statement she had given at the police station on the grounds that the statement was involuntary, that it was taken in violation of her *Miranda* rights, and that it was obtained as a result of incompetent and ineffective representation by her attorney. She also filed a motion to suppress the physical evidence taken from her home. An evidentiary hearing was held in the Superior Court regarding these motions. The court denied both motions. The Superior Court ruled, in denying the motion to suppress the statement, that Shipley's statement was voluntary, that there was no

coercion on the part of the police detectives in obtaining the statement, and that Shipley did not have a right to counsel (and hence effective counsel) at the point of the proceedings when the statement was taken.

The case proceeded to trial in Superior Court on March 23, 1987. Throughout the trial, there was testimony indicating that William Shipley had been missing since July 28 or July 29, 1984. No one at the Maturity Center had had any contact with him after the Hockessin trip on July 28. William Shipley's son testified that he had not seen or heard from him. The office responsible for disbursing William's pension checks had not received any communication from him regarding a change of address nor any objections after the disbursements in his name ended in September, 1984. There had been no activity in William Shipley's credit union account after his disappearance. The records of William Shipley's bank account disclosed no unusual activity before July 28, 1984 and no activity at all by him after that date.

The State presented forensic scientific evidence and expert testimony which tended to indicate that the dismembered body was that of William Shipley and that he had been killed in his bed with his .38 gun. Dr. Henry C. Lee, the Chief of the Forensic Laboratory for the State of Connecticut, testified that blood tests performed on the dismembered body revealed that the individual was blood type O, with a genetic marker of PGM type 1, ESD type 1. William Shipley had blood type O. Dr. Ali Z. Hameli, the Chief Medical Examiner for the State of Delaware, testified that the severed head contained upper and lower dentures. Hospital records revealed that William Shipley had full upper and lower dentures. A forensic odontologist, Dr. Lowell J. Levine, compared the dentures in the severed head with a photograph of William Shipley and concluded that the teeth visible in the picture were the same as the dentures. Dr. John J. Fitzpatrick, a diagnostic radiologist, upon examining and comparing radiographs of William Shipley and radiographs of the body, found that the two matched. Dr. Ellis Kerley, a physical an-

thropologist, testified that William Shipley's height and age were within the estimated range of heights and ages of the dismembered body. Agent Wayne Oakes testified that hair taken from a baseball cap found in the Shipley residence was microscopically similar in all characteristics to hair found on the body.

Dr. Lee also testified that the bloodstain found on the Shipley mattress was caused by a single event, was less than one year old, and was classified as being within group O, PGM type 1. Herbert L. MacDonnell, a professor of criminalistics at Corning University and Director of the Laboratory of Forensic Science, testified that the cut in the mattress cover had been made within the recent past.

Agent Albrecht conducted a comparative analysis of the .38 caliber bullet recovered from the head and the box of cartridges seized at the Shipley residence. He testified that all the projectiles were made by the same manufacturer (Smith & Wesson/Fiocchi) at the same time and location during the period from 1970 until early 1974. And while a ballistics test revealed that the fatal bullet had not been fired from the pistol seized at the Shipley home, the caliber of this bullet was consistent with another .38 caliber revolver that Christie had given her husband upon his retirement from the Baltimore police force. Bonniwell testified that William Shipley had shown him this revolver (a stainless steel .38 snub-nosed revolver) less than a month before his disappearance. Corporal Bryson testified that the police did find the box in which this revolver had been packed by the manufacturer as well as several spent cartridges. Albrecht testified that the cartridges were fired by a different gun than the pistol seized.

In addition, William Shipley's son and Bonniwell both testified that William Shipley owned a considerable amount of meat butchering equipment, including a meat saw. The police, however, could find no meat saw in the Shipley home.

Further testimony revealed that the particular insecticide/deodorant "Can Care" pads and holders found both in the garbage bags containing body parts and at the Shipley residence were unique. They had been manufactured by Shell Oil Company sometime before 1974 and the entire product line had been discontinued in 1975. Agent Oakes testified that the blue fibers found in the trunk of Christie Shipley's car microscopically matched the fibers of the blanket that a junk dealer's employee had taken home from the side of Persimmon Tree Lane.

Dr. Hameli considered the findings of the various experts who had assisted in identifying the body and the results of his own examination of the remains and concluded that the dismembered body was that of William Shipley. He also testified that the position of the point of entry of the fatal bullet wound and the direction of the bullet's travel were consistent with the victim having been shot while lying in bed.

Upon considering the evidence, the jury found Christie Shipley guilty of murder in the first degree and possession of a dangerous weapon during the commission of a felony.

I.

Shipley first contends that the trial court erred in not suppressing her pre-arrest statement, taken at the police station on August 21, 1984. She argues that the statement was taken in violation of her fifth, sixth, and fourteenth amendment rights to effective assistance of counsel under the United States and Delaware Constitutions, contending that her counsel was ineffective in advising her to give the statement.

Shipley relies on the case of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), to measure the level of attorney performance which she had a right to expect. In that case, the United States Supreme Court used a "reasonably effective assistance" standard to determine the effectiveness or ineffectiveness of counsel. Shipley contends that her attorney's performance fell short of the standard. Specifically, she contends that his advice that she give a statement, deliv-

ered without any investigation and explanation of the extent of the information known to the police, was insufficient to allow her to make a rational, self-interested decision about speaking to the police officers. She further contends that her counsel's ineffectiveness was encouraged and abetted by the police officers whom she alleges lied to her about the reasons they had for taking the statement and engaged in "psychological warfare" in order to obtain the statement. We find this contention to be without merit.

### A.

▆▆▆ The United States Supreme Court has recognized that where a sixth amendment right to counsel exists, it protects the accused's fundamental right to a fair trial. *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). The sixth amendment recognizes the right to the assistance of counsel because of the vital role counsel plays in the adversarial system to obtain just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair. *Strickland v. Washington,* 466 U.S. 668, 685, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984). That a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional requirement. The right to counsel is the right to the effective assistance of counsel. *Evitts v. Lucey,* 469 U.S. 387, 395, 105 S.Ct. 830, 835, 83 L.Ed.2d 821 (1985); *Cuyler v. Sullivan,* 446 U.S. 335, 344, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980).

▆▆▆ The right to *effective* assistance of counsel, however, is dependent on the right to counsel itself. *Wainwright v. Torna,* 455 U.S. 586, 587–88, 102 S.Ct. 1300, 1301–02, 71 L.Ed.2d 475 (1982) (*per curiam*). It is unquestioned that a criminal defendant is entitled to the assistance of counsel at all critical stages of the judicial process. Del. Const. art. I, § 7, *Potter v. State,* Del.Supr., 547 A.2d 595 (1988); *Gideon,* 372 U.S. at 342–45, 83 S.Ct. at 795–97, 9 L.Ed.2d at 804–06. The right to counsel

becomes applicable when the government's role shifts from investigation to accusation. *Moran v. Burbine,* 475 U.S. 412, 430, 106 S.Ct. 1135, 1146, 89 L.Ed.2d 410 (1986). A person is thus entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him—whether by way of formal charge, preliminary hearing, indictment, information or arraignment. *Flamer v. State,* Del. Supr., 490 A.2d 104, 113 (1983), *cert. den.,* 464 U.S. 865, 104 S.Ct. 198, 78 L.Ed.2d 173 (1983), *cert. den.,* 474 U.S. 865, 106 S.Ct. 185, 88 L.Ed.2d 154 (1985) (citing *Brewer v. Williams,* 430 U.S. 387, 398–99, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977)) (internal citations omitted).

▆▆▆ Although Shipley was questioned at the police station, the adversarial proceedings had not yet begun on August 21, 1984 when police officers questioned her about the disappearance of her husband. For an interrogation, no more or less than for any other "critical" pretrial event, the possibility that the encounter may have important consequences at trial, standing alone, is insufficient to trigger the sixth amendment right to counsel. *Moran,* 475 U.S. at 432, 106 S.Ct. at 1146, 89 L.Ed.2d at 428.

▆▆▆ However, Shipley further argues that because she was given her *Miranda* warnings at the police station, albeit in a non-adversarial proceeding, she thereby became entitled to effective assistance of counsel. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). She argues that the police officers engaged in "psychological warfare" and deceived her into believing she had a right to counsel at this stage of the proceedings by the recitation of the *Miranda* warnings. Having relied on this so-called "deception", she now contends that she was entitled not only to counsel, but to effective counsel, under the sixth and fourteenth amendments.

In presenting such an argument to this Court, Shipley asks that we reexamine the existing law with regard to the event which triggers the sixth amendment right to counsel. It is well settled, however, that

the giving of *Miranda* warnings does not in and of itself create a right to the effective assistance of counsel. *Moran*, 475 U.S. at 430, 106 S.Ct. at 1145, 89 L.Ed.2d at 427. Further, after a review of the record and upon hearing counsel's argument in open court, we find no evidence which would indicate that the police officers knew of the alleged ineffectiveness of Shipley's counsel or that they used that knowledge to deceive Shipley and induce her to give a statement. We find that Shipley voluntarily accompanied the police officers to the station, chose an attorney with whom to consult about her situation, and decided to make a statement to the police officers after consultation with that attorney. As noted above, the traditional effectiveness-of-counsel analysis under the sixth amendment finds no application here because there was no initiation of the adversarial judicial process until February 6, 1985, six months after the statement was given to police. Under the circumstances, we find no error in the trial court's denial of Shipley's motion to suppress the statement.

### B.

Shipley next contends that the trial court erred in failing to suppress her statements under her fifth amendment rights again, relying on *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Shipley argues that because she was given *Miranda* warnings prior to the police interview on August 21, 1984, she believed that she had a right to effective counsel at that point and relied upon that counsel to provide adequate advice. She further contends that since her attorney's advice was inadequate, she was unable to make an informed, self-interested decision about speaking to the police officers. Therefore, she contends that her statements to the police were not made voluntarily. Finally, Shipley argues that the police officers violated their obligation under *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), in that they did not cease all questioning when Shipley initially indicated that she did not wish to make a statement. We rule that these contentions are without merit.

The *Miranda* case requires that police interrogation cease until counsel is present if the defendant requests counsel. The police are not required to provide counsel to advise the suspect; they need only cease their interrogation until counsel is present. Further, once a suspect is in custody and has expressed a desire to deal with the police only through counsel, he is not subject to further interrogation unless there is a valid waiver of his right to counsel. *Edwards*, 451 U.S. at 484–85, 101 S.Ct. at 1885, 68 L.Ed.2d at 386. In this situation, responses to further questioning of a suspect are admissible only on a finding that the suspect initiated further discussions with the police and knowingly and intelligently waived the right the suspect had invoked. *Smith v. Illinois*, 469 U.S. 91, 95, 105 S.Ct. 490, 493, 83 L.Ed.2d 488 (1984) (citing *Edwards*, 451 U.S. at 486 n. 9, 101 S.Ct. at 1885 n. 9, 68 L.Ed.2d at 387 n. 9); *Lovett v. State*, Del.Supr., 516 A.2d 455, 463–65 (1986), *cert. den.*, 481 U.S. 1018, 107 S.Ct. 1898, 95 L.Ed.2d 504 (1987).

We find that Shipley's reliance on the *Miranda* and *Edwards* cases is misplaced. The thrust of the fifth amendment is to prevent governmental coercion. *Colorado v. Connelly*, 479 U.S. 157, 170, 107 S.Ct. 515, 523, 93 L.Ed.2d 473 (1986). *Miranda* applies only when an individual is subject to custodial interrogation. Therefore, the giving of *Miranda* warnings does not in and of itself make the full protection of the *Miranda* rulings applicable. *California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). It is clear that Shipley was not in custody at this time. Although the detectives wanted to exclude Shipley from her residence during the execution of the search warrant and question her about William Shipley's disappearance, she voluntarily went to the police station. A formal arrest did not occur until six months later, and there is no indication that Shipley was restrained in any way from leaving the station on August 21, 1984.

Further, the evidence establishes that Shipley's statements were made

voluntarily, and she was not required to incriminate herself by speaking to the police officers. *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *State v. Rooks*, Del.Supr., 401 A.2d 943 (1979). This Court has held that the question of voluntariness is a question of fact to be determined after consideration of the totality of the circumstances. The question in each case is whether the defendant's will was overborne when a statement was made. *Baynard v. State*, Del.Supr., 518 A.2d 682, 690 (1986) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226–27, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973)). The attention of the trial judge must necessarily be focused on the behavior of the police and the mental and physical make-up of the defendant in order to determine whether the statement of the defendant was the product of a rational intellect and free will. *Baynard*, 518 A.2d at 691.

The Court is satisfied, after a consideration of the totality of circumstances, that Shipley's statements on August 21, 1984 were voluntary. As the trial court noted, at the time of her statement, Shipley was forty-six years old. She had been employed as a Delaware Correction officer transporting prisoners to court. Prior to that, she was a Baltimore police officer for 14 years. She was not suffering from any physical or mental impairment which would have impelled her to make a statement, nor was she under the influence of any alcohol or drugs. The detectives did not threaten her, nor did they physically or psychologically coerce her to make a statement. The defendant received *Miranda* warnings and acknowledged in the presence of her attorney that she understood her rights. Her attorney also explained to her in private that she did not have to make a statement. Her attorney was present during the questioning and available to consult with her. The length of the interview was neither unreasonable nor excessive, and it was concluded at counsel's request. Her ultimate decision to give a statement was voluntarily made by her while she was alone with

her attorney and out of the presence of the police.

The fifth amendment does not guarantee a fully informed choice or the adequacy of an attorney's advice, nor is the right to remain silent concerned "with moral and psychological pressures to confess emanating from sources other than official coercion." *Colorado v. Connelly*, 479 U.S. at 170, 107 S.Ct. at 523, 93 L.Ed.2d at 486 (quoting *Oregon v. Elstad*, 470 U.S. 298, 305, 105 S.Ct. 1285, 1291, 84 L.Ed.2d 222 (1985)). Under the circumstances, Shipley's contention that her statement was not voluntary is without merit. Given our rulings as to Shipley's rights under the fifth, sixth, and fourteenth amendments, her underlying contention that her attorney did not render effective assistance is deemed to be irrelevant.

### II.

Shipley next contends that the State failed to prove the *corpus delicti* of the crime of murder, independent of Shipley's statement, and that the State failed to sufficiently establish the essential elements of first degree murder beyond a reasonable doubt. This Court notes that this contention was raised only in Shipley's brief on appeal. Shipley, through her counsel, conceded at oral argument that a *prima facie* case for murder did in fact exist and that sufficient evidence was presented for the jury to return a guilty verdict. This Court agrees and rules that the evidence, independent of Shipley's statement to the police, established that a murder had occurred and that the evidence presented was sufficient to sustain Shipley's conviction of murder in the first degree.

### A.

 The rule as to the *corpus delicti* requires some evidence of the existence of a crime, independent of the defendant's confession, to support a conviction. *Bright v. State*, Del.Supr., 490 A.2d 564, 569 (1985).[1] Its purpose is to prevent indi-

---

**1.** As the State has noted, the *corpus delicti* rule requires some independent corroboration of a

defendant's *confession* as a precondition to conviction. Here, there was no confession. Rath-

viduals from being convicted of a crime by confession when there is no other evidence that a crime has been committed. *Id. See Lemons v. State,* 49 Md.App. 467, 433 A.2d 1179, 1181 (1981). It is enough if there is some evidence of the *corpus delicti* corroborating the confession, provided that all the evidence taken together proves the *corpus delicti* beyond a reasonable doubt. *Nelson v. State,* Del.Supr., 123 A.2d 859, 862 (1956). To establish the *corpus delicti* of murder for the purpose of corroborating a defendant's confession, it must be shown that the deceased is dead and that his death was caused by a criminal act. *State v. Miller,* Del. Oyer & Term., 32 A. 137 (1892). *Accord Lemons,* 433 A.2d at 1183.

■ Shipley contends that the State failed to prove that the deceased was William Shipley and that his death was criminally caused. We find that sufficient, independent evidence existed to establish these two elements and, therefore, Shipley's contention is found to be without merit.

The prosecution produced abundant evidence that William Shipley was dead. A team of forensic experts examined the human remains found in the various locations in Dover, the city where he lived and where he had last been seen. The estimated height and age of the body corresponded to William Shipley's known height and age. The body contained blood group O. William Shipley's blood and the blood on the Shipley mattress were also group O. In addition, both the body and the mattress blood were enzyme type PGM 1. When a chest x-ray known to be of William Shipley was compared to an x-ray of the torso, a radiologist concluded that the two x-rays were of the same individual. Hair from the body and hair from a baseball cap found in the Shipley residence were microscopically similar in all observable characteristics. A forensic odontologist compared the dentures found in the severed head with a photograph of William Shipley and concluded that the teeth visible in the

photograph were the same as the dentures of the deceased. Dr. Ali Z. Hameli, the Chief Medical Examiner for the State of Delaware, combined these expert findings with the results of his own examination of the remains and concluded that the dismembered body was that of William Shipley.

In addition, William Shipley had disappeared suddenly and inexplicably. Testimony at trial established that he was never seen or heard from again after July 28, 1984. His automobile remained in the driveway of his home, the office responsible for administering his pension received no notice of a change of address, his credit union showed no activity after July 28, 1984, and his bank accounts showed no withdrawals which he could have initiated after the date he disappeared.

Other evidence indicated that William Shipley's death was caused by criminal means and specifically, by murder. The cause of death was a bullet wound to the victim's neck at the base of the skull which severed the spine. The position of the wound and the bullet's path indicated that the victim had been lying down at the time of the murder. The bloodstains on the Shipley mattress, which matched the blood type of the dismembered body in both ABO group and PGM enzyme type, were of recent origin, as was the cut which removed a piece of the mattress covering over the stain.

Ammunition similar to the bullet recovered from the victim's head was found in the Shipley residence. Elemental metal analysis determined that the fatal bullet had been manufactured at the same location and at about the same time as the Shipley ammunition and was likely to have come from the same box. It was also known that William Shipley owned a revolver capable of firing this ammunition. Witnesses had seen this weapon as recently as four weeks before the murder, but it was missing from the box when the police

er, there were a number of statements designed to be exculpatory but which, by virtue of inconsistencies, proved incriminating. It is questionable whether these statements fall within the

reach of the rule, but this Court, for the purposes of this opinion, will assume that the statements are equivalent to a "confession."

searched the Shipley residence, and it was never found. The dismemberment of the body also indicated that the perpetrator had access to the appropriate implements to accomplish the task. William Shipley owned such implements, including a meat saw given to him by his son which he kept at home and which (like the revolver) was never found. Such unequivocal evidence indicates to this Court that the *corpus delicti* of murder was established.

### B.

 Having so ruled, this Court further finds that all of the evidence taken together establishes beyond a reasonable doubt each element of the crime of murder in the first degree. *Davis v. State*, Del.Supr., 453 A.2d 802, 803 (1982). "When a defendant argues that the evidence is insufficient to support a guilty verdict, 'the relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Williams v. State*, Del.Supr., 539 A.2d 164, 168 (1988) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)) (emphasis in original). In doing so, the Court does not distinguish between direct and circumstantial evidence. *Williams*, 539 A.2d at 167 (citing *Holland v. United States*, 348 U.S. 121, 139, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954)).

Shipley was convicted of murder in the first degree and possession of a dangerous weapon during the commission of a felony. The State contends that Shipley had the motive to murder her husband and that her explanations regarding his disappearance were repeatedly inconsistent and untrue. Although Shipley neither confessed nor admitted to the murder of her husband, we agree with the State and rule that sufficient circumstantial evidence exists to sustain her conviction.

Testimony revealed that Shipley had indicated to several friends and co-workers that her marriage was deteriorating. Prior to his disappearance, Shipley had complained that her husband drank too much,

became mean-tempered when drinking, and had been having affairs with numerous other women. She had also discussed her marital problems with Martha Bowman, the manager of a liquor store, telling her she was dissatisfied with her marriage because of her husband's alcoholism and infidelity. She also had indicated that William Shipley verbally abused her.

The evidence presented to the jury regarding Shipley's statements and actions subsequent to her husband's disappearance revealed numerous inconsistencies. Shipley stated repeatedly that her husband had left in his Mercury Cougar. The police discovered, however, that this car had been traded in for another in early July, nearly a month before the murder. The car had been parked in a dealer's lot since it had been traded in. Shipley claimed that the bloodstain on her mattress resulted from her husband's tooth extractions, but those extractions had occurred at least eight years before. Expert testimony indicated that the stain was not more than a year old. Shipley claimed that her husband told her he was quitting his job at the Maturity Center, while the testimony of many witnesses indicated that the Center was William's predominant interest in life and that immediately before his disappearance he had discussed with great interest and anticipation future Center activities. Shipley claimed that her husband had obtained money to finance his disappearance from a variety of sources. There was no factual basis for such claims. Shipley stated that while her husband was moving out his possessions on Sunday, July 29, it looked as if they were conducting a "yard sale." Neighbors testified, however, that they observed no unusual activity at the Shipley residence on that day.

Finally, the manager of the liquor store where Shipley worked part-time testified that sometime after July 30, she gave the defendant a Sun Country Cooler carton. The severed head found on August 9 was in such a carton. Shipley had also been asking questions about the procedures followed at various dumps in the area. Unusual "Can Care" deodorizer pads found in

the body bags were also found in the Shipley residence.

We conclude that the evidence presented at trial was sufficient for the jury to conclude that Shipley was guilty of murder in the first degree and of the weapon offense. We affirm the judgment of the Superior Court.

## III.

Finally, Shipley contends that the trial court committed reversible error in violation of her fifth, sixth, and fourteenth amendment rights by appointing a public defender to represent her when all she requested was the expenditure of public funds to hire an expert witness. Shipley maintains that she wanted to retain her private counsel, in addition to having access to public funds to hire experts.

The State contends that appellate review is unavailable on this issue because Shipley's motion for public funds was presented *ex parte* and then sealed by the trial court at Shipley's request. The State argues that because Shipley failed to order the transcript of the *ex parte* hearing, she is barred from raising this issue on appeal. While it is well-settled that the Court can evaluate issues raised on appeal only by reviewing the facts as they appear in the record, *Tricoche v. State*, Del.Supr., 525 A.2d 151, 154 (1987); Supreme Court Rule 9(e)(ii) and Rule 14(e), this Court has established guidelines to govern requests for the expenditure of public funds by indigent criminal defendants who are represented by privately retained counsel. Under the circumstances, we will reiterate those guidelines.

Applications by privately retained counsel, on the grounds of indigency, for public funds for assistance in the defense of a criminal case, are deemed to be applications by private counsel for leave to withdraw as counsel and for representation thenceforth by the Public Defender on the ground of indigency. *Office of the Public Defender v. Thompson*, Del. Supr., 451 A.2d 835, 837 (1982). Private counsel may continue to assist the Public Defender, but without the expectation of compensation from public funds. *Id.* The guidelines set forth in the *Thompson* case were designed to balance a defendant's limited right to choose her own counsel and various public interests, including the fixing of budgetary responsibility and the limited funds available.

Shipley, by contending that the ruling in the *Thompson* case violates her "right" to choose her own counsel, urges this Court to reverse the *Thompson* case on constitutional grounds. The right to counsel does not mean an absolute right to particular counsel of one's choice. *In re Kennedy*, Del.Supr., 472 A.2d 1317, 1331 (1984), *cert. den., Kennedy v. Board of Professional Responsibility*, 467 U.S. 1205, 104 S.Ct. 2388, 81 L.Ed.2d 346 (1984). The essential aim of the sixth amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he or she prefers. *Wheat v. United States*, 486 U.S. 153, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140, 148 (1988). Further, a defendant may not insist on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant. *Id.*

In this case, because Shipley could not afford the costs of an expert witness who could produce the testimony she sought, the trial court appointed a Public Defender. *Thompson*, 451 A.2d at 837; *Potter v. State*, Del.Supr., 547 A.2d 595, 598 (1988). By that action, the court granted Shipley's request for the services of the expert which were said to be necessary to an adequate defense. *Riley v. State*, Del. Supr., 496 A.2d 997, 1017 (1985).

There is no indication from the record that Shipley's case was prejudiced by the appointment of the Public Defender. In fact, Shipley concedes that because of the expenditure of funds, she was able to hire "a world-renowned anthropologist" to testify on her behalf. Furthermore, Shipley's private counsel was *not* thereby removed from her case. He could have remained and participated in her defense, along with the appointed Public Defender. Under the

circumstances, the trial court's decision to appoint a Public Defender was well within the mandate of settled Delaware law and did not violate Shipley's constitutionally protected rights.

We AFFIRM the judgment of the Superior Court.